In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1060

Leon A. McLeod, Randy Sanders,
Don Newman, et al.,

Plaintiffs-Appellants,

v.

Arrow Marine Transport,
Incorporated,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 655--John W. Darrah, Judge.

Argued May 14, 2001--Decided July 12, 2001


   Before Bauer, Rovner, and Diane P. Wood,
Circuit Judges.

   Bauer, Circuit Judge. Plaintiffs-
appellants (or "drivers"), ten former
semitrailer tractor truck drivers for
Arrow Marine Transport, Inc. ("AMT"),
brought a hybrid breach of contract/duty
of fair representation action under sec.
301 of the Labor Management Relations
Act, 29 U.S.C. sec. 185(a) against AMT
for failure by their exclusive bargaining
agent, the Chauffeurs, Teamsters and
Helpers Union Local No. 301 ("union"),
who had entered into a collective
bargaining agreement ("CBA") on their
behalf with AMT, to fairly resolve their
grievances. After several adverse rulings
by the district court, the drivers
appeal. We affirm.

BACKGROUND

   AMT, an Illinois trucking corporation,
hauls goods between locales for various
construction and manufacturing companies.
Arrow Specialized Carriers ("ASC"), a
non-unionized company also in Illinois,
provides broker services in that it finds
available haul jobs and hires other
trucking companies to do them. Michael
Trinski is president and co-owner of both
AMT and ASC. ASC often hired AMT to
perform the jobs it found.

Plaintiffs-appellants all, at one time and in some capacity, worked for AMT. Leon McLeod, Randy Newman, Rick Sturm, William Lama, and Joe LaFlamme were owner-drivers, meaning that they drove their own tractors when hauling goods for AMT. Willis Rushing, George Kwapniewski, Jason Clavey, and Brian Cusker were employee-drivers hired to drive AMT trucks. Randy Sanders started his employ as an employee-driver and eventually became an owner-driver. Each of the drivers left AMT as follows: (1) Sturm prior to 1997; (2) Sanders on March 17, 1997; (3) Newman on April 17, 1997; (4) McLeod on April 28, 1997; (5) Lama on September 6, 1997; (6) Kwapniewski and Clavey on January 8, 1998; (7) Rushing on January 15, 1998; (8) Cusker on January 19, 1998; and (9) LaFlamme on January 24, 1998.

According to Article 8, Section 4 of the CBA, all employees were to be paid either hourly or on a percentage basis. All of the plaintiffs-appellants earned a percentage of the gross revenue paid to AMT per haul. Accordingly, their salary varied with each job, so, in order to assure the drivers that they were being paid the right amount, Article 17, Section 2 of the CBA promised that "[d]etailed statements will be furnished by companies to owner-drivers/employees at least once a month, designating all owner-drivers/employees full gross income and expenses for the month. Any money due at this time must be paid."

The CBA also detailed the procedure for employees to follow if they had a grievance. As per Article 15, Section 1(A), a grievance had to be raised with the Foreman by the employee alone or with a union representative within five days of its occurrence; if it was not resolved, the employee, either alone or with a union representative, would speak to the Plant Supervisor and then to a member of management; if still not resolved, the union referred the grievance to the Permanent Labor Committee ("PLC"), a four-member body which would hold a hearing and vote on a resolution; and if still unresolved, on to arbitration.

This elaborate grievance procedure could be bypassed in certain limited

circumstances. Article 15, Section 2 created an exception to the procedure for any "willful or flagrant violations of the wage or overtime provisions . . . ." Article 18, Section 1 declared: "Authorized representatives of the Union shall have access to the Employer's establishment at all reasonable times for the purpose of . . . ascertaining compliance with this Agreement (which shall include the right to inspect and audit payroll records, time cards and work sheets)." Furthermore, Article 18, Section 2 instructed: "Should a Certified Public Accountant, designated by the Union, certify in writing specifically that an Employer is violating the wage scale . . . based upon the records for an audit . . . , then the grievance procedure shall have no application . . . and the Union shall be permitted all legal and economic recourse . . . ."

From here, the facts become dense because, despite an attempt by the drivers to unify themselves and obscure unattractive facts, we are really dealing with three distinct sets of plaintiffs-appellants. The first set includes McLeod, Sanders, Newman, Sturm, and Lama. These drivers filed a grievance in late 1997, months after they left AMT. The second set encompasses Kwapniewski, Clavey, and Cusker, whose grievance was timely filed, heard, and resolved by the PLC. Third and finally there is Rushing and LaFlamme, who never filed a grievance but joined this suit. Thus, for clarity's sake, we reserve further factual narrative until we address the issues specific to each set of drivers.

The drivers raise four issues on appeal, which are that the district court erred in: (1) granting summary judgment for AMT against Kwapniewski, Cusker, and Clavey; (2) granting summary judgment for AMT against Rushing and LaFlamme; (3) striking parts of their brief and fact statement; and (4) dismissing the claims of McLeod, Sanders, Newman, Lama, and Sturm.

While these four issues presented in their appellate brief seem straightforward, all of the drivers' arguments are infused with an overarching contention, and a rather serious one at that. They assert that Trinski formed and used ASC to funnel money away from AMT

and into his own pocket. They believe that AMT paid ASC a broker fee for finding AMT jobs, jobs that AMT could have procured on its own, and that the broker fee was being skimmed off the top of the gross revenue AMT earned for each haul job, thereby reducing the amount from which the drivers' percentages were calculated. They believe that this wage-skimming scheme would have been discovered if the union had conducted a proper audit in resolution of their grievances. Therefore, they claim that through this scheme AMT breached the CBA and that the union breached its duty to fairly represent its members by failing to perform an audit by which this breach would have been discovered.

The drivers' theory is not one to take lightly, but, given the factual landscape (the nature of the drivers' grievances) and legal landscape (our standard of review) of this case, it is simply not one we may take at all. In other words, the drivers' theory did not come to fruition until discovery in this lawsuit was well under way, which is common in many cases; however, under the law governing this hybrid suit, we look at whether the union acted arbitrarily given the facts known at the time it acted. At the time the union acted there was not a hint of this theory--not in the drivers' grievances, not in the minutes from the hearing for the grievance filed by one set of drivers, and for that matter, hardly even in the complaint or amended complaint. Given this, the foundation of the drivers' appeal is swept away. As the union was unaware of this theory at the time it handled the drivers' grievances, it cannot be faulted for only addressing the particular issues raised.

DISCUSSION

"National labor policy has been built on the premise that by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining . . . ." NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 180 (1967). However, as always when individuals join together, "[t]he complete satisfaction of all who are represented is hardly to be expected." Id. Nevertheless, each employee is bound

by the union's decisions because that is what they bargained for. See id. To help balance the power bestowed upon the union to exclusively represent all employees in employment disputes, "'a concomitant duty of fair representation [is owed] to each of its members.'" Garcia v. Zenith Elecs. Corp., 58 F.3d 1171, 1176 (7th Cir. 1995) (quoting Cleveland v. Porca Co., 38 F.3d 289, 295 (7th Cir. 1994)); see Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 44 (1998).

The type of case filed by the drivers is referred to as a hybrid suit because it is comprised of two causes of action that are "inextricably interdependent." See DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 164-65 (1983). To prevail, "[a]n employee must establish that the union breached its duty of fair representation to maintain an actionable sec. 301 claim against the employer." Filippo v. Northern Ind. Pub. Serv. Corp. Inc., 141 F.3d 744, 748 (7th Cir. 1998); see McKelvin v. E.J. Brach Corp., 124 F.3d 864, 869 (7th Cir. 1997). "A union breaches its duty to fairly represent its members where its conduct toward one of its members is 'arbitrary, discriminatory, or in bad faith.'" Crider v. Spectrulite Consortium, Inc., 130 F.3d 1238, 1243 (7th Cir. 1997) (quoting Vaca v. Sipes, 386 U.S. 171, 190 (1967)); see Marquez, 525 U.S. at 44. The drivers' sole argument is that the union acted arbitrarily in how it conducted the audit./1 We examine the objective adequacy of the union's actions in determining whether they were arbitrary. See Trnka v. Local Union No. 688, 30 F.3d 60, 63 (7th Cir. 1994).

"The doctrine of fair representation is an important check on the arbitrary exercise of union power, but it is a purposefully limited check . . . ." United Steelworkers of Am. v. Rawson, 495 U.S. 362, 374 (1990). "[T]he test for determining whether particular conduct is arbitrary can be quite forgiving." Garcia, 58 F.3d at 1176. "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness, 'as to be irrational.'" Porca, 38 F.3d at 295 (quoting Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67 (1991)); see Marquez, 525 U.S. at

45; Ooley v. Schwitzer Div. Household Mfg. Inc., 961 F.3d 1293, 1302 (7th Cir. 1992). "This 'wide range of reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." Marquez, 525 U.S. at 45-46. A course of action may be considered irrational only when it is "without a rational basis or explanation." Id. at 46. "The union must provide 'some minimal investigation of employee grievances,' but the thoroughness of this investigation depends on the particular case, and 'only an egregious disregard for union members' rights constitutes a breach of the union's duty.'" Garcia, 58 F.3d at 1176 (quoting Castelli v. Douglas Aircraft Co., 752 F.2d 1480, 1483 (9th Cir. 1985)).

As noted, the CBA sets forth a grievance procedure to settle disputes over its interpretation. Generally, courts are reluctant to usurp the union's function of construing a CBA, and therefore we are "highly deferential" in reviewing a union's actions, O'Neill, 499 U.S. at 78, and will not "'substitute [our] judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call,'" Garcia, 58 F.3d at 1176 (quoting Ooley, 961 F.2d at 1302).

A.  McLeod, Sanders, Newman, Lama, and Sturm

McLeod, Sanders, Newman, Lama, and Sturm contend that the district court erred in granting AMT's motion to dismiss their claim for failure to state one. We review the district court's grant of a motion to dismiss de novo, accepting as true all well-pleaded facts and drawing all reasonable inferences in the nonmoving party's favor; however, we are not obliged to accept as true conclusory statements of law or unsupported conclusions of fact.

In late 1997, plaintiffs-appellants' counsel and counsel for the union exchanged a series of letters. In a letter dated December 1st, plaintiff's counsel, on behalf of McLeod, Sanders, Sturm, Newman, and Lama, requested that statements per Article 17, Section 2 of the CBA be provided to them because they believed they may have been "underpaid by various amounts." Counsel asked that the

letter be treated as a formal grievance. Counsel for the union responded that since these drivers had not been employed by AMT for some time, their grievance was untimely under the five day rule in Article 15, Section 1(A). Although agreeing that the five day window had closed, plaintiffs-appellants' counsel replied that since their grievance constituted a "willful or flagrant violation of the wage or overtime provisions" under Article 15, Section 2, the five day rule was inapplicable. The union disagreed and held to its decision that the five day rule applied to this grievance.

The district court concluded that the union did not act arbitrarily because it was not wholly irrational for the union to have classified this grievance as one covered by the five day rule. The court reasoned that the generalized nature of the grievance did not present a complaint "so egregious that it was irrational for the union to decide that they were not 'willful or flagrant violations.'" The district court went on to state that "[r]egardless of whether the court agrees with the union's interpretation, it was not completely unreasonable for the union to perceive . . . the absence of income statements . . . as [a] smaller issue[ ] of the type that the parties had agreed to grieve under the CBA." Therefore, the court dismissed their claim because they could not sustain that the union had breached its duty of fair representation.

We agree. It was not arbitrary for the union to conclude that this grievance regarding possible discrepancies in payment and failure to receive monthly statements was subject to the normal grievance procedure. It was rational at the time for the union to conclude that there was nothing "willful or flagrant" being charged. The crux of the drivers' argument is that the wage-skimming scheme constitutes a "willful or flagrant" violation. This may well be true, but the union was not apprised of this possibility in late 1997 when this grievance was raised.

This brings us to another of the drivers' overarching contentions. They surmise that it is unfair to expect them to have presented their wage-skimming theory to the union when they lodged their grievances because they could not

have discovered that this scheme was at work. This point is well taken since under Article 18, Section 1 of the CBA, the union is given the power to investigate these sorts of matters, not the employees. However, the drivers' collective cry of unfairness is a bit distorted. They postulate that the union ought to have undertaken an audit of AMT as soon as an allegation of possible underpayment was raised by the drivers. However, the separate allegations then raised by the drivers did not state clearly their theory as it is presently described. There is nothing in the letter-grievance that indicates anything approaching a "willful or flagrant" violation (although neither the CBA nor the union offers a clear definition of this phrase). And, in light of this, we cannot say that the union's understanding of the matter at the time was irrational.

## B. Kwapniewski, Cusker, and Clavey

The drivers argue that the district court's grant of AMT's summary judgment motion was improper given that the evidence showed that the union breached its duty of fair representation.

On January 16, 1998, Kwapniewski, Cusker, and Clavey filed a detailed grievance, which raised nine concerns, the last being phrased as follows:

Article 15, Section 2

In the case of willful or flagrant violations of the wage or overtime provisions, the union will not be required to go through the grievance procedure[.] Request Company billing sheets to be shown for all jobs paid the percentage rate.

Prior to the PLC hearing, the President of Local 301, Robert Haffner (also the person who helped write and negotiate the CBA) spoke with these drivers about their grievances both on the phone and in person. On February 9th, they aired their grievances before the PLC. With regard to their grievance under Article 15, Section 2, the minutes of the hearing reveal that Kwapniewski, Cusker, and Clavey specifically asked to be afforded the opportunity to examine the billing sheets from J.W. Peters, one of AMT's customers, because they had "only [Trinski's] word

as to how much the gross revenue of the truck actually is for the day." At the close of the hearing, Kwapniewski, Cusker, Clavey, and Trinski confirmed that they felt they had received a fair and impartial hearing. After deliberation, the PLC concluded that this particular grievance would be "[r]esolved with a Union audit."

Soon thereafter, Haffner conducted an audit of the billing sheets of J.W. Peters in accordance with the PLC's directive. Haffner went to Trinski's office and was given a stack of J.W. Peters' billing sheets. He chose approximately ten randomly, reviewed them and made calculations. After about half an hour, Haffner concluded that AMT had paid the drivers in compliance with the CBA. In his deposition, Haffner recounted that he may also have examined check stubs and bills of lading, but did not request to examine any other documents.

The district court granted summary judgment against Kwapniewski, Cusker, and Clavey because given the facts known at the time, Haffner was only directed to look at the billing sheets of J.W. Peters. He followed this dictate and found nothing extraordinary that would have led him to believe that further investigation was warranted. There was no reason for him to have wandered off in hopes of unearthing a wage-skimming scheme.

Yet, the drivers maintain their claim that the union's audit was a "sham" because it did not discover the wage-skimming scheme and because it should have hired a certified public accountant to perform the audit. We entertain high hopes that if any hint of a wage-skimming scheme had been presented to the union it would have fulfilled its obligation to all of its members by thoroughly investigating under Article 18, Section 2. But this is not the situation here. The PLC was presented with a request for an examination of billing sheets, specifically those of J.W. Peters. That was the sole purpose of the audit. The scope of the audit might not have been as comprehensive as the drivers now wish, but the drivers themselves limited its scope by their request. Based on the nature of the grievance filed and hearing held, we agree with the district court

that the audit performed was not arbitrarily done and did not breach the union's duty to fairly represent its members.

C. Rushing and LaFlamme

Generally, an employee must exhaust the CBA's grievance procedures before pursuing judicial remedies, however, an employee may be excused from doing so if: (1) resorting to the grievance procedure would be futile; (2) the employer through its conduct repudiated the grievance procedure itself; or (3) the union breached its duty of fair representation. See Hammer v. Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am., 178 F.3d 856, 858 (7th Cir. 1999); Roman v. United States Postal Serv., 821 F.2d 382, 388 (7th Cir. 1987); Bailey v. Bicknell Minerals, Inc., 819 F.2d 690, 692 (7th Cir. 1987).

The district court granted summary judgment for AMT against Rushing and LaFlamme because neither had filed a grievance as required by the CBA. Rushing and LaFlamme argued that this decision was in error because exhaustion of the grievance procedures would have been futile given the "perfunctory audit" that the union conducted on behalf of the grievance filed by Kwapniewski, Cusker, and Clavey. The district court rejected this argument.

The district court concluded that Rushing and LaFlamme could not have been dissuaded from grieving based on any arbitrary action or decision by the union in handling the Kwapniewski, Cusker, and Clavey grievance. The court so found because that grievance had been filed on January 16, 1998 and not resolved until a month later, and Rushing had left AMT on January 15th, and LaFlamme on January 24th; therefore, the PLC hearing and audit had taken place over a month after they were gone, and since they had only five days to file a grievance per the CBA, their chance to file any grievance expired five days after they left, well before the "perfunctory audit" by the union could have dissuaded them from following the grievance procedure. The court noted that Rushing and LaFlamme's futility plea was further belied by the fact that they, along with the other drivers, filed the complaint in this suit

(and on May 29th filed an amended complaint) some six days before the PLC hearing on the Kwapniewski grievance in which an audit was granted. We agree with the district court.

In addition, Rushing and LaFlamme assert a new futility theory before this Court. They claim that in light of how the union handled the McLeod grievance, filing their own would have been futile. While this argument was waived, we take a moment to say that it would not have been futile for Rushing and LaFlamme to file a timely grievance based upon the handling of the McLeod grievance because it was not disposed of by the union on the merits, rather it was disregarded as untimely. Furthermore, both the Kwapniewski and McLeod grievances raised the issue of possible underpayment, but neither presented anything approaching the serious wage-skimming allegation now raised; therefore, it would not have been futile for someone to have raised the issue; it had yet to be squarely raised, or even hinted at. Lastly, the assertions of futility by Rushing and LaFlamme are little more than that--assertions. See Douglas v. American Info. Technologies, Corp., 877 F.2d 565, 574 (7th Cir. 1989) (finding that failure to exhaust grievance procedure was not excused because plaintiff's "mere unsupported assertion of futility was insufficient to raise the issue properly"). Summary judgment was, therefore, proper.

D. Motion to Strike

The drivers contend that the district court erred in granting AMT's motion to strike parts of their brief in response to AMT's summary judgment motion and statement of additional facts. The stricken parts of the brief and fact statement pertained to the drivers' claim that AMT breached the CBA. AMT argued that the drivers' facts and allegations on this issue were irrelevant to the summary judgment motion because the only issue before the court was whether the union breached its duty; the issue of whether AMT breached the CBA would arise only after that portion of the case had been established by the drivers. The district court agreed.

"We review the decision to grant or deny a motion to strike under an abuse of

discretion standard." Whitted v. General Motors Corp., 58 F.3d 1200, 1203 (7th Cir. 1995). "Decisions that are reasonable, i.e., not arbitrary, will not be questioned under this standard." Id.

The drivers argue that it is illogical to analyze whether the union breached its duty without examining the severity of AMT's breach of the CBA against which the union ought to have been representing its members. The drivers argue that since they are required to prove both elements as part of the hybrid claim they should have been permitted to present both. Specifically, they say that "only when the depth of defendant's malfeasance is understood, does the breach of the Teamsters' duty to fairly represent their members comes into full focus."

As we have instructed, a claim that an employer breached a CBA will not succeed unless the employee can also demonstrate that the union violated its duty of fair representation. The drivers had to establish that the union breached its duty before the issue of whether AMT breached the CBA would be entertained. AMT submitted a motion for summary judgment arguing that there was no genuine issue of material fact as to whether or not the union breached its duty. As this was the sole issue before the district court, it was far from an abuse of discretion for it to strike the information about any AMT breach of the CBA as irrelevant to the issue then under consideration. Since the facts and allegations that the drivers sought to add to the mix were not before the union at the time relevant to this lawsuit, it would have added nothing to the drivers' claim except clutter. And, as we have considered the drivers' additional facts and allegations as part of our de novo review, we are all the more at ease in holding that the district court properly exercised its discretion in striking these items.

CONCLUSION

We Affirm all of the district court's rulings. The request for class certification, denied by the district court, needs no further consideration.

FOOTNOTES

/1 In their brief, plaintiffs-appellants superficially assert that the union acted in "bad faith" (by writing that the "audit was absurdly deficient as to indicate an intentional cover-up," that the audit was a "sham," and that the union's "aimless and misguided review of AMT's records was, at best, a whitewash, and, more likely, undertaken in bad faith to find nothing"). Since they have not substantiated this assertion, we decline to address it.