# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 02-2126 & 02-2127

RODNEY NEAL and ANTHONY BRANDON,

*Plaintiffs-Appellants*,

*v.*

NEWSPAPER HOLDINGS, INC.,

*Defendant-Appellee.*

———————

**Appeals from the United States District Court
for the Central District of Illinois.
Nos. 00 C 2176 & 00 C 2177—Michael P. McCuskey**, *Judge.*

———————

ARGUED JANUARY 7, 2003—DECIDED NOVEMBER 5, 2003

———————

Before COFFEY, ROVNER, and EVANS, *Circuit Judges.*

ROVNER, *Circuit Judge.* After losing their jobs with Newspaper Holdings, Inc. ("NHI"), Rodney Neal and Anthony Brandon each filed a so-called "hybrid" section 301/fair representation action against NHI and their union pursuant to section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, and sections 8(b) and 9(a) of the National Labor Relations Act, 29 U.S.C. §§ 158(b), 159(a). *See generally DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 163-65, 103 S. Ct. 2281, 2290-91 (1983); *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 86-87, 110 S. Ct. 424, 436 (1989). They contended that the company had discharged them

in breach of the collective bargaining agreement between NHI and the union and that the union in turn had breached its fiduciary duty to them as union members by failing to pursue timely grievances on their behalf. The union was dismissed by stipulation from both suits after Neal and Brandon settled with it, leaving the company as the sole defendant. The district court consolidated the two suits for decision and subsequently entered summary judgment in favor of NHI, reasoning that the plaintiffs had not shown that the union had breached its duty of fair representation, as they must in order to succeed on claim under section 301. *See, e.g., Filippo v. Northern Indiana Public Serv. Corp.,* 141 F.3d 744, 748 (7th Cir. 1998). We affirm.

## I.

NHI operates a newsprint business in Danville, Illinois under the name Commercial-News. Neal and Brandon worked for NHI from July 1998 (when NHI acquired Commercial-News) until January 2001, when each was fired. Both men were members of the Graphics Communications International Union, Local No. 657C ("GCIU"), which served as their bargaining representative.

Neal was fired after he failed to report for work on two days in January 2001. NHI employees were required to report anticipated absences before their shifts began; but it was common practice for employees simply to call in and leave a message on their supervisor's voicemail. When illness caused Neal to miss his scheduled shifts on January 14 and 15, 2001, he left messages on each of those days prior to the beginning of his shift on the voicemail of Mike Latoz, his supervisor and foreman. Nonetheless, when he reported for work on January 18, Latoz informed him that NHI was terminating him for having missed his shifts on the 14th and 15th and for having failed to report his absence in

advance as the company required.

Neal contacted George Wilson, his shop steward (referred to within the union as the chapel chairman) and asked Wilson what the union was going to do about his discharge. Wilson told Neal that he needed some proof that Neal had telephoned in to report his absences and suggested that Neal obtain his calling records from the telephone company. In the meantime, Wilson took it upon himself to check Latoz's office voicemail, where he found evidence that Neal had, in fact, left messages to advise NHI that he would not be reporting for work on the 14th and 15th. Wilson made a tape recording of those messages and gave the tape to Neal. Wilson also discussed Neal's discharge with Latoz and Scott Porter, NHI's Production Director, on January 24. Wilson confronted Latoz with Neal's messages but Latoz, according to Wilson, denied knowing about them or how they got onto his voicemail. After meeting briefly in private with Porter, Latoz informed Wilson that the company would not rehire Neal. Two weeks after Neal was fired, Wilson advised him that the discharge decision was final; he also informed Neal that the time for filing a grievance had already expired.

At the time that Neal and Brandon were discharged, the collective bargaining agreement between GCIU and NHI contained the following provision regarding employee grievances:

> A grievance hereunder shall be defined as any dispute arising during the term of this agreement involving interpretation or application of a specific provision of this Agreement. The employee or employees involved must discuss any such grievance with their chapel chairman and with the foreman . . . within five (5) regular working shifts following the day upon which the event giving rise to the grievance occurred. If either party desires to process further such grievance referred to above, then it must be referred to the Joint Standing

> Committee [made up of two representatives appointed by the employer and two appointed by the union] within [ten] (10) regular working shifts following the day upon which the event giving rise to the grievance occurred.

Collective Bargaining Agreement, § XIV(1). Neal and Brandon both had been involved in the negotiations that culminated in the agreement containing this provision. Wilson testified that it was GCIU's practice to require a union member to submit a written grievance request form when he wished the union to formally pursue a grievance on his behalf; Wilson would then transmit the grievance to NHI. According to Wilson, this requirement had been in place for years and was common knowledge among employees of the pressroom, where both Neal and Brandon worked. Neal testified in his deposition that he had asked Wilson to file a grievance on his behalf, but it is undisputed that Neal never tendered a written grievance form to Wilson or any other union official. Wilson had filed grievances on Neal's behalf in the past, but on those occasions Neal had completed written grievance forms. Neal Deposition Exs. 2, 4, 5. Not having received such a form on this occasion, Wilson did not pursue a grievance challenging Neal's termination.

NHI terminated Brandon after he refused a last-minute demand that he work overtime for the company. Brandon was but fifteen minutes away from the end of his shift on the evening of January 19, 2000, when Charles Lindsay, the assistant supervisor of the pressroom, informed Brandon that he could not leave as scheduled at 10:00 p.m. because the company had overtime work for him to do. Brandon, whose next shift was scheduled to begin at 6:00 a.m. on the following day (January 20), refused the demand and left work at 10 o'clock. Brandon was of the view that because the collective bargaining agreement was silent as to whether or not overtime work was mandatory, he was not obligated to comply with Lindsay's demand. But when Brandon reported for work the following morning, Latoz,

his supervisor, informed him that the company had terminated him for insubordination.

NHI previously had warned Brandon that the failure to complete an assigned work shift could result in his termination. On April 5, 1999, Brandon received a written warning from Latoz after he had refused to stay at work for a scheduled shift two days earlier. Latoz's memorandum concluded with the following admonition:

> Whenever you are assigned a work shift, you are expected to be here and work that shift. Your behavior . . . is insubordination by refusing to stay and work and refusing to follow a direct order by your supervisor. Any repeated incident of the above will result in discipline up to and including termination.

Brandon Deposition Ex. 5.

On January 21, Brandon spoke with Wilson about his termination. According to Brandon, Wilson agreed that his discharge was "wrongly done" (Brandon Deposition at 18) although by Brandon's own account the two did not discuss the facts underlying his discharge at that time (*id.*). Brandon asked Wilson to do "[a]ll that he could possibly do" to secure his reinstatement. *Id.*

Following Wilson's conversation with Brandon, Latoz spoke with Wilson and told him why Brandon had been fired; Lindsay and other pressroom employees also recounted what had happened. Wilson asked these individuals no questions; he simply listened to their accounts. Believing that employees were obligated to work overtime if asked to do so by a supervisor, Wilson concluded that there was "no evidence of Mr. Brandon not being guilty of his termination." Wilson Deposition at 29.

On February 21, 2000, just over four weeks after NHI fired him, Brandon asked Wilson for a grievance form so that he could protest his discharge. As in Neal's case,

Wilson testified that GCIU normally files a grievance only after a union member presents a written grievance form to the chapel chairman. Wilson said that it was not his obligation to prepare a grievance for a union member; instead, he simply filed the grievance with the company after the employee filled out the form. Like Neal, Brandon had completed grievance request forms on prior occasions. Brandon Deposition Exs. 2-4. As it turned out, the form that Wilson gave to Brandon was not the correct form. Having previously served as a union representative (Brandon not only had participated in negotiations over the collective bargaining agreement in effect at the time of his discharge, but had served as assistant chapel chairman prior to 1998), Brandon had the appropriate form in his locker at NHI. He was able to retrieve the correct form and after his attorney completed the form, Brandon tendered it to Wilson on February 28. Wilson told Brandon that he would pass the form on to NHI, and he (eventually) did so, although he considered the grievance untimely; NHI received the form on March 7, 2000.

On March 8, 2000, the day after it received Brandon's grievance, NHI determined that it was time-barred and so advised Wilson by letter. On or about March 21, Wilson gave Brandon a copy of that letter.

Based on the foregoing facts, the district court granted summary judgment in favor of NHI. The court concluded that the plaintiffs could not show that GGIU had breached the duty of fair representation that it owed to them as union members, and without a valid fair-representation claim against the union, the plaintiffs could not recover from NHI for breach of the collective bargaining agreement. The court noted that there was no evidence of bad faith or discrimination on the union's part. Nor was there evidence suggesting that the union had treated either plaintiff in an arbitrary fashion: although Neal and Brandon both asserted that GCIU had failed to file timely grievances on their

behalf, the court observed that neither plaintiff had timely completed a written grievance request form and tendered it to their steward in accordance with union practice. At most the facts suggested that the union had handled the plaintiffs' discharges in a negligent fashion, and negligence, the court reasoned, did not suffice to establish a breach of the union's duty of fair representation. *Neal & Brandon v. Newspaper Holdings, Inc.*, Nos. 00-2176 & 00-2177, Order (C.D. Illinois Mar. 12, 2002).

Neal and Brandon asked the court to reconsider its summary judgment decision pursuant to Fed. R. Civ. P. 59(e). The court denied the motion, observing that the plaintiffs had failed to identify any basis for reconsideration. *Neal & Brandon v. Newspaper Holdings, Inc.*, Nos. 00-2176 & 00-2177, Order (C.D. Illinois April 1, 2002).

## II.

Our review of the district court's decision to enter summary judgment in favor of the union is de novo. Summary judgment is appropriate (indeed, required) so long as the facts material to the resolution of the case are not in dispute and the movant (here, NHI) is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *e.g.*, *Roxford v. Ameritech Corp.*, 335 F.3d 661, 663 (7th Cir. 2003). In deciding whether that is true in this case, we must view the record in the light most favorable to the nonmovants (Neal and Brandon) and grant them the benefit of all reasonable inferences that may be drawn from the facts. *Id.*; *see also Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

Our review of the district court's decision to deny the appellants' Rule 59(e) motion to alter or amend the judgment is deferential. Only if the district court abused its discretion in denying the request will we disturb its decision. *E.g.*, *Dersch Energies, Inc. v. Shell Oil Co.*, 314 F.3d 846, 855

(7th Cir. 2002).

We may make short work of the plaintiffs' contention that the district court abused its discretion in denying their Rule 59(e) motions. The purpose of such a motion is to bring the court's attention to newly discovered evidence or to a manifest error or law or fact. *E.g.*, *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). But the motions that Neal and Brandon filed identified no such basis for altering or amending the court's summary judgment ruling; the plaintiffs simply took the opportunity to reargue the merits of their cases. The court thus committed no abuse of discretion in denying the motions to reconsider. We therefore turn to the heart of the appeal—whether, on the facts before us, NHI was entitled to summary judgment.

As we noted at the outset, the appellants have filed hybrid section 301/fair representation suits claiming that NHI breached the collective bargaining agreement and that GCIU breached the duty of fair representation it owes to its members. *See Reed v. United Transp. Union*, 488 U.S. 319, 328, 109 S. Ct. 621, 627 (1989); *McLeod v. Arrow Marine Transp., Inc.*, 258 F.3d 608, 612-13 (7th Cir. 2001). In order for a plaintiff to prevail in such an action, he must have a meritorious claim against both the union and the employer; the claims are interlocking in the sense that neither is viable if the other fails. *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1241 (7th Cir. 1997). Thus it is that NHI sought and obtained summary judgment on ground that GCIU did not breach the duty of fair representation that it owed to Neal and Brandon as union members—without a valid claim for breach of the duty of fair representation, the plaintiffs cannot proceed against NHI. *Id.* at 1241, 1243; *McKelvin v. E.J. Brach Corp.*, 124 F.3d 864, 869 (7th Cir. 1997). We must therefore decide whether the facts, viewed favorably to Neal and Brandon, would support a finding that GCIU did breach the duty of fair

representation. *See id.* at 868. We conclude that they would not.

A union breaches the duty of fair representation only if its actions are arbitrary, discriminatory, or in bad faith. *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S. Ct. 903, 916 (1967). Each of these possibilities must be considered separately in determining whether or not a breach has been established. *See Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1302 (7th Cir. 1992), discussing *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 111 S. Ct. 1127 (1991); *see also, e.g.*, *Filippo v. Northern Indiana Public Serv. Corp.*, *supra*, 141 F.3d at 748-49; *Crider*, 130 F.3d at 1243.

We may quickly dispose of the latter two possibilities. Whether or not a union's actions are discriminatory or in bad faith calls for a subjective inquiry and requires proof that the union acted (or failed to act) due to an improper motive. *E.g.*, *Crider*, 130 F.3d at 1243; *Trnka v. Local Union No. 688, UAW*, 30 F.3d 60, 63 (7th Cir. 1994); *Ooley*, 961 F.2d at 1304; *see also Mock v. T.G.&Y. Stores Co.*, 971 F.2d 522, 531 (10th Cir. 1992). Although Neal and Brandon suggest in passing that GCIU may have failed to pursue grievances on their behalf for an improper reason, the record lends no support to that possibility, as the district court itself pointed out. Thus, only if GCIU's actions were arbitrary might Neal and Brandon have a valid claim against the union.

Whether a union's actions are arbitrary calls for an objective inquiry. *McLeod*, 258 F.3d at 613. "A union's actions are arbitrary only if the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Filippo*, 141 F.3d at 749 (internal quotation marks, citations, and ellipsis omitted); *see also Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 46, 119 S. Ct. 292, 300 (1998); *McLeod*, 258 F.3d at 613. This is an "extremely deferential standard" that precludes the courts from "substitut[ing] their judgment for that of the union, even if, with

the benefit of hindsight, it appears that the union could have made a better call." *Ooley*, 961 F.2d at 1302. Moreover, "mere negligence, even in the enforcement of a collective-bargaining agreement, would not state a claim for breach of the duty of fair representation." *United Steelworkers of America v. Rawson*, 495 U.S. 362, 372-73, 110 S. Ct. 1904, 1911 (1990).

Insofar as grievances are concerned, "a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion." *Vaca*, 386 U.S. at 191, 87 S. Ct. at 917. "The union must provide 'some minimal investigation of employee grievances.'" *Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1176 (7th Cir. 1995), quoting *Castelli v. Douglas Aircraft Co.*, 752 F.2d 1480, 1483 (9th Cir. 1985). "[B]ut the thoroughness of this investigation depends on the particular case, and 'only an egregious disregard for the union members' rights constitutes a breach of the union's duty.'" *Garcia*, 58 F.3d at 1176, quoting *Castelli*; *see also Vaca*, 386 U.S. at 194-95, 87 S. Ct. at 919; *McLeod*, 258 F.3d 613; *Filippo*, 141 F.3d at 749. The union is not obliged to take all member grievances to arbitration. *Vaca*, 386 U.S. at 191, 87 S. Ct. at 917; *Reed v. International Union of UAW*, 945 F.2d 198, 202-03 (7th Cir. 1991). Rather, it has discretion to act in consideration of such factors as the wise allocation of its own resources, its relationship with other employees, and its relationship with the employer. *Rupe v. Spector Freight Sys., Inc.*, 679 F.2d 685, 691 (7th Cir. 1982); *see also Reed*, 945 F.2d at 203.

Although Neal and Brandon chastise GCIU for failing to pursue grievances on their behalf, it is undisputed that neither of them timely initiated that process by tendering a written grievance form to the union. As set forth above, the collective bargaining agreement between NHI and GCIU required an employee to bring his grievance to the attention of his chapel chairman and foreman no more than five regular working shifts after the date of the event giving

rise to the grievance. Grievances selected for further action were to be forwarded to the Joint Standing Committee within ten regular working shifts of that same date. The undisputed facts indicate that it was GCIU's practice for an aggrieved union member to submit a written grievance form to the chapel chairman, who would in turn forward that form to NHI; this was common knowledge among those who, like Neal and Brandon, worked in the pressroom. In this case, Neal never completed such a form. Brandon did so, but well outside of the time period during which the grievance was to be submitted to the Joint Standing Committee as called for in the collective bargaining agreement. *See Filippo*, 141 F.3d at 749 ("The Union cannot be faulted for requiring that its own procedures be followed."); *compare Vencl v. International Union of Operating Engineers, Local 18*, 137 F.3d 420, 426 (6th Cir. 1998) (absent justification or excuse, union's own failure to timely take basic steps in pursuit of grievance may constitute arbitrariness).

True, Neal testified in his deposition that he asked Wilson to file a grievance, and Brandon testified that he asked Wilson to do whatever he could do and to follow all procedures to secure his reinstatement. Although in each case, Wilson looked into the circumstances underlying discharge decision, he did not (so far as the record reveals) remind Neal or Brandon that they were required to submit written grievance request forms nor did he take other steps to ensure that such forms were completed and submitted so that their grievances could be forwarded to the company and/or Joint Standing Committee within the time specified by the collective bargaining agreement. On the facts before us, one certainly might argue that this was negligent conduct for a union steward. But nothing in the record suggests that the omission was more than negligent, and simple negligence is not enough to establish a breach of fiduciary duty in this context. *Rawson*, 495 U.S. at 372-73,

110 S. Ct. at 1911; *but see Vencl*, 137 F.3d at 426 (union's own failure to file timely written request for arbitration, after union member filed grievance and employer denied it, constituted arbitrariness).

It is also worth pointing out that both Neal and Brandon were on notice of the need to tender a written grievance request form to the union. Neal was familiar with that form: Wilson previously had submitted grievances on Neal's behalf that bore his signature. Neal Deposition Exs. 2, 4, 5. For his part, Brandon had served as the assistant chapel chairman and he, like Neal, had been involved in negotiations over the collective bargaining agreement. He not only knew that there was a form used for grievances in the pressroom (Brandon Deposition at 19), but he had the proper form in his own locker (*id.* at 20). And like Neal, Brandon had submitted grievance request forms before. Brandon Deposition Exs. 2-4. Given both men's familiarity with the grievance process, Wilson's failure to make sure that they completed and submitted written grievance forms in a timely fashion is less disturbing than it otherwise might be; the failure to file a timely grievance cannot, in this case, fairly be ascribed to the union. *Cf. Vencl*, 137 F.3d at 426 (union failed to file timely arbitration request because its business agent was on vacation).

Moreover, Wilson's actions belie the notion that he handled the plaintiffs' complaints in a perfunctory fashion or with egregious disregard for their interests. Wilson spoke with Neal about his discharge, advised him to gather evidence in order to establish that it was improper, took steps of his own to verify that Neal had, in fact, left messages with his supervisor on the dates of his absences, and spoke with Neal's supervisor and production director about the discharge decision. But company officials were unwilling to reconsider, and at that point the only means left to challenge the discharge was the timely pursuit of a grievance, which Neal did not request in writing. In Brandon's case,

Wilson spoke with Latoz, Lindsay, as well as other employees who had witnessed the events underlying Brandon's discharge. After doing so, Wilson concluded that the decision to discharge Brandon was valid. Nonetheless, when Brandon later submitted a written grievance request form, Wilson signed the form and passed it along to NHI.

Under these circumstances, the district court properly concluded that NHI was entitled to summary judgment. As it stands, the record would not permit a reasonable factfinder to conclude that GCIU breached the duty of fair representation it owed to both Neal and Brandon as union members. Without a valid claim against the union, the plaintiffs cannot obtain relief from NHI. *Crider*, 130 F.3d at 1241; *McKelvin*, 124 F.3d at 869.

## III.

We AFFIRM the district court's judgment. NHI's request for an award of sanctions pursuant to Federal Rule of Appellate Procedure 38 is DENIED; the appeal, although unsuccessful, was not frivolous in view of such cases as *Vencl*, 137 F.3d at 426.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*