# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 02-3878

GRACE M. KAPELANSKI and
STANLEY J. KAPELANSKI,

*Plaintiffs-Appellees*,

v.

SCOTT JOHNSON,

*Defendant-Appellant*.

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 00 C 2131—**Milton I. Shadur**, *Judge.*

———————

ARGUED APRIL 2, 2004—DECIDED NOVEMBER 24, 2004

———————

Before EASTERBROOK, MANION, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Stanley J. Kapelanski, a Chicago-area dentist, and his wife and office manager, Grace M. Kapelanski, brought this action in diversity for common law fraud and breach of fiduciary duty under Illinois law, against the defendant, Scott Johnson, a businessman based in Florida. The Kapelanskis sought to recover monies they had conveyed to Johnson in a series of investments that included an "Off-Shore Trading Program" and the purchase of auto-

matic teller machines for leasing. After trial, the jury found in favor of the plaintiffs and awarded them compensatory and punitive damages. In an oral ruling, the district court denied Johnson's post-trial motions to amend the judgment, or for a new trial, and entered judgment on the verdict." Johnson now appeals the jury verdict. Johnson argues that the district court should have amended the judgment or ordered a new trial because Johnson was unfairly prejudiced. Specifically, Johnson argues that he was prejudiced by the district court's questioning of him on the witness stand and the district court's action in allowing plaintiffs to change their theories about Johnson's fraud during the trial. Additionally, Johnson asserts that the damage awards were untenable. For the reasons stated below, we affirm.

## I.  Background

Plaintiff Stanley Kapelanski, an immigrant from Poland, practices dentistry in Chicago, Illinois, and his wife, plaintiff Grace Kapelanski, manages the dental practice. The Kapelanskis were interested in making financial investments. Calvert Heskiel, a friend of the Kapelanskis, put them in contact with defendant Scott Johnson, an independent businessman based in Florida. After a series of telephone conversations with Johnson, the Kapelanskis transferred $15,000 to Johnson in July 1998 to invest in what Johnson termed an "Offshore Venture" in the "Gateway International Group."

The investment relationship between the parties expanded in late 1998. In October 1998, Johnson and the Kapelanskis physically met in Chicago. Johnson urged the Kapelanskis to invest in automatic teller machines ("ATMs") through his company. The Kapelanskis agreed to purchase the ATMs and

wired Johnson a total of $301,500 in four separate installments from October 26, 1998 to February 5, 1999.[1]

On October 26, 1998, the Kapelanskis also decided to invest an additional $100,000 in a deal the parties referred to as the Offshore Trading Program ("OTP"). The Kapelanskis transferred $100,000 to the escrow account of Feder & Dunn, P.A., Johnson's Florida-based attorneys, for investment in the OTP. In December 1998, Johnson sent the Kapelanskis a check for $18,000. This amount represented a $3,000 return on their July 1998 investment. The Kapelanskis repeatedly requested information from Johnson regarding both their OTP and ATM investments. These requests included items such as proof of purchase, locations, and serial numbers for the ATM machines. Johnson did not respond to the Kapelanskis' requests, and the plaintiffs never received any proof of purchase for the ATMs, nor any information pertaining to the OTP.

The Kapelanskis filed this action for fraud and breach of fiduciary duty under Illinois law against Johnson. The Kapelanskis sought both compensatory and punitive damages for their ATM and OTP investments. During the litigation, despite three document requests and a court order

---

[1] The Kapelanskis' transfers for the intended purchase of the ATMs are itemized as follows:

   (1)  $190,000 on October 26, 1998
   (2)  $30,000 on January 26, 1999
   (3)  $41,500 on February 4, 1999
   (4)  $40,000 on February 5, 1999

The Kapelanskis transferred these ATM funds to New Century Investors Incorporated. New Century Investors Incorporated is Johnson's dissolved corporation. According to Johnson's testimony, he used New Century Investors Incorporated's bank account for money transfers.

demanding Johnson's compliance, Johnson failed to produce evidence that the OTP investment program actually existed. Johnson also failed to produce any evidence pertaining to proof of purchase of the ATMs.

The matter went to trial[2] where only three witnesses, the Kapelanskis and Johnson, testified. The jury was shown plaintiffs' exhibits of wire transfers. These wire transfers demonstrated that two days after Johnson had transferred $100,000 of the plaintiffs' money to a Russel Pierce[3] for the OTP, Pierce sent $200,000 to Johnson. Plaintiffs presented evidence at trial which showed that Johnson placed the $301,500 for the ATMs into his business account. From this business account, Johnson later withdrew almost $400,000 to purchase a ski house in Colorado, a condominium, designer mountain bikes, boating equipment and two luxury auto-mobiles—a Mercedes-Benz and a Jaguar.

The jury returned a verdict in favor of the Kapelanskis. The jury awarded the Kapelanskis $100,000 in compensatory damages and $331,250 in punitive damages on their fraud claim. The district court entered judgment on the jury's verdict. The district court also, in an oral ruling, denied the defendant's request for a new trial.

Johnson appeals on several grounds. He argues that the district court improperly denied his post-trial motion to amend the judgment or for a new trial. Johnson claims that there was insufficient evidence presented at trial to support the verdict for the plaintiffs. Johnson also argues that the compensatory and punitive damage awards are invalid. Johnson further contends that the district court judge committed error when he selectively questioned Johnson

---

[2] The jury was not presented with instructions on the breach of fiduciary duty claim and it is not a subject of this appeal.

[3] Johnson claimed that Russel Pierce took the Kapelanskis' money.

and allegedly showed disbelief of Johnson's credibility in front of the jury. Finally, the defendant argues that the district court allowed the plaintiffs to alter their trial theory in violation of its pre-trial order.

## II.  Analysis

### A.  Post-Trial Motion

As a federal court sitting in diversity, federal law governs our evaluation of Johnson's motion to amend the judgment or for a new trial under Federal Rule of Civil Procedure 59. *M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1407 (7th Cir. 1991). We review a district court's decision to deny such motions for abuse of discretion. *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 368 (7th Cir. 2003); *Carter v. Moore*, 165 F.3d 1071, 1079 (7th Cir. 1998). Under the abuse of discretion standard, "the proper inquiry is not how the reviewing court would have ruled if it had been considering the case in the first place, but rather whether any reasonable person could agree with the district court." *EEOC v. Century Broadcasting Corp.*, 957 F.2d 1446, 1460 (7th Cir. 1992).

In ruling on a motion for new trial, federal law requires a district court to determine "whether 'the verdict is against the weight of the evidence . . . the damages are excessive, or . . . for other reasons, the trial was not fair to the party moving.'" *Id.* (quoting *General Foam Fabricators, Inc. v. Tenneco Chems., Inc.*, 695 F.2d 281, 288 (7th Cir. 1982)). We will not set aside a jury verdict if a reasonable basis exists in the record to support the verdict, viewing the evidence in the light most favorable to the prevailing party, and leaving issues of credibility and weight of evidence to the jury. *Carter*, 165 F.3d at 1079.

As a federal court sitting in diversity, we apply state law to all substantive claims. *See, e.g., Mut. Serv. Cas. Ins. Co.*

*v. Elizabeth State Bank*, 265 F.3d 601, 612 (7th Cir. 2001). The parties do not dispute that we are to apply Illinois state law in our review of plaintiffs' fraud claim. As the district court's instructions to the jury indicated, to sustain an action for fraud under Illinois law, the plaintiff must prove by clear and convincing evidence that: (1) the defendant made a false statement of material fact; (2) the defendant knew or believed that the statements were false, or the statements were made with a reckless disregard of whether they were true or false; (3) the statements were made with the intent to induce action; (4) the plaintiff reasonably believed the statements and justifiably acted in reliance on those statements; and (5) the plaintiff suffered damages as a result. *See Soules v. Gen. Motors Corp.*, 402 N.E.2d 599, 601 (Ill. 1980).

Contrary to Johnson's assertion, there is reasonable basis in the record to support the jury's verdict. At trial, Johnson admitted that he represented to the Kapelanskis that he would invest their money in ATMs. The Kapelanskis relied on that representation. Johnson admitted at trial that he knew of the Kapelanskis' reliance. The Kapelanskis did in fact transfer their money to Johnson based on these expectations. The Kapelanskis presented documentary evidence of the wire transfers they made for the ATMs. The Kapelanskis also submitted documentary evidence of the check for $100,000 they sent to Johnson's attorneys, as instructed, to be invested in the "Offshore Trading Program." Johnson also admitted on the stand that he did not produce any document to the Kapelanskis that would account for the $100,000.

In addition, the jury saw evidence which reflected that Johnson's attorneys sent $100,000 to the "Russel Pierce Consulting Company," which, within days of receipt, transmitted $200,000 to an account held by New Century Investors Incorporated. Johnson admitted that he never produced documentation or other evidence that would prove the

existence of the OTP. Johnson failed to produce this evidence despite a court order compelling him to do so. The Kapelanskis never received proof of purchase of the ATMs and none was presented to the jury. Further, Grace Kapelanski testified that after failing to return repeated phone calls, Johnson eventually did get in touch with her only to call her a "belly-acher" and to insist that she did not "know how to play with the big boys."

Johnson claimed that Pierce was the individual responsible for stealing the Kapelanskis' money. However, Johnson presented no proof as to Pierce's actual existence.[4] Johnson also failed to demonstrate that the OTP existed. In addition, Johnson failed to comply with a court order to submit evidence demonstrating the existence of the OTP. Johnson admitted this fact on the witness stand. From this, a reasonable jury could properly conclude that (1) Johnson appropriated the ATM money for his own personal benefit and (2) either there was no OTP or that Pierce and Johnson had worked in tandem to commit the OTP fraud on the plaintiffs.

Johnson also points to conflicts in the parties' testimony to challenge the sufficiency of the evidence supporting the verdict. For example, Johnson claims that Grace Kapelenski actually insisted that the couple's money go into the OTP over Johnson's alleged warnings about the risks and dangers of investing in it. However, Stanley Kapelanski testified that he did not remember Johnson attempting to dissuade his wife or him from investing the $100,000. In any case, the jury is entitled to weigh the evidence presented to it and to evaluate the credibility of the witnesses. *See Sheenan v. Donlen Corp.*, 173 F.3d 1039, 1046 (7th Cir. 1999) (reaffirming that "the jurors, and they alone, are to judge of [sic] the facts, and weigh the evidence.") Therefore, any conflicts

---

[4] Pierce did not testify for either party. In addition, Pierce's whereabouts could not be determined.

between the parties' testimony was apparently resolved by the jury in the Kapelanskis' favor, given the verdict for the plaintiffs.

Johnson also claims that his promise to invest the money is not actionable as a fraudulent misrepresentation. For support, Johnson directs the court's attention to *People v. Murphy-Knight*, 618 N.E.2d 459 (Ill. App. Ct. 1993). In *Murphy-Knight*, the court explained that "[e]ven a false promise of future conduct with no current intent to fulfil[l] that promise will not constitute fraud." 618 N.E.2d at 463. Johnson's reliance on *Murphy-Knight* and similar cases is misplaced. The investment opportunity in *Murphy-Knight* actually existed, while here, the Kapelanskis suggest that there was no evidence that "Russel Pierce Consulting Corporation," "Russel Pierce," "Offshore Trading Program," or the ATMs actually existed. Also, the *Murphy-Knight* court was careful to caution against the use of the above-quoted language in all cases involving future action. Specifically, the *Murphy-Knight* court held, "an exception to the general rule exists whereby a false promise as to future circumstances may be actionable if the false statements were part of a fraudulent scheme." *Id.* (citing *Steinberg v. Chicago Med. Sch.*, 371 N.E.2d 634, 641 (Ill. 1977)). Although the Kapelanskis understood that Johnson made no guarantees, the Kapelanskis justifiably did not believe Johnson would simply convert the transferred money for his own personal use. Indeed, it was reasonable for the jury to conclude on the evidence presented that Johnson hatched a plan to, in effect, steal the Kapelanskis' money rather than invest it. In sum, the evidence provides a reasonable basis to support the verdict and therefore we cannot find that the district court abused its discretion in refusing to grant Johnson a new trial.

As for Johnson's motion to alter or amend the judgment, we conclude the district court properly dismissed the motion. Such motions are "to bring the court's attention to

newly discovered evidence or to a manifest error [of] law or fact." *Neal*, 349 F.3d at 368; *see also FDIC v. Meyer*, 781 F.2d 1260, 1268 (7th Cir. 1986). Johnson's motion did not present any new evidence. Moreover, as we found the fraud verdict to be sound for the reasons discussed above, the district court did not abuse its discretion when it denied this motion.

## B. Damages

### 1. Compensatory

We review challenges to the propriety of a compensatory damages award for abuse of discretion. *Lamply v. Onyx Acceptance Corp.*, 340 F.3d 478, 483 (7th Cir. 2003); *see also EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1285 (7th Cir. 1995). In making this determination, the "relevant inquiries may include whether the award is monstrously excessive, whether there is no rational connection between the award and the evidence, and whether the award is roughly comparable to awards made in similar cases." *Lamply*, 340 F.3d at 483-84 (internal citations omitted).

Johnson attacks the validity of the $100,000 compensatory award by arguing that the evidentiary connection between the verdict and the award is absent. He asserts that the district court's instructions to the jury on damages amounted to an interrogatory.[5] Specifically, Johnson argues that the

---

[5] The district court's instruction to the jury stated:

If you decide for plaintiffs on the question of liability in accordance with the earlier instruction, you must then fix the amount of money that will reasonably and fairly compensate them for any of the following elements of damages proved by the evidence to have resulted from defendant's conduct:

(1) any resulting loss from their transfer of $100,000 on October 26, 1998 [for OTP];

(continued...)

only reasonable way the jury could have arrived at a value of $100,000 is if it found the defendant liable on the OTP fraud claim only. Furthermore, Johnson contends that the verdict on the OTP fraud claim cannot be sustained because the evidence, or the inferences they allow, in no way support that claim. Johnson asserts that if we do not find that the jury hinged liability solely on the OTC claim, then we must conclude that the verdict was an impermissible compromise under *Nat'l Fire Ins. Co. of Hartford v. Great Lakes Warehouse Corp.*, 261 F.2d 35, 38 (7th Cir. 1958). We disagree.

As a preliminary matter, we agree with the plaintiffs that the instruction did not function as an interrogatory. The instruction did not restrict the jury to merely decide the issue of liability on the different transactions and then apply the fixed amount provided in the instruction. The instruction gave the jurors guidance and it was properly within their domain to weigh evidence, assess witness credibility, and determine whether the Kapelanskis suffered

---

[5] (...continued)

    (2)  any resulting loss from their transfer of $190,000 on October 26, 1998 [for ATMs];

    (3)  any resulting loss from their transfer of $30,000 on January 26, 1999 [for ATMs];

    (4)  any resulting loss from their transfer of $41,500 on February 4, 1999 [for ATMs];

    (5)  any resulting loss from their transfer of $40,000 on February 5, 1999 [for ATMs].

The defendant claims that this instruction functioned as an interrogatory, and that the selection of only one of these transfers as the basis of liability necessarily means the jury found liability on that loss to the exclusion of all others. Conversely, the plaintiffs maintain that the instruction permitted the jury to decide on any combination of the above amounts, or portions of those amounts, to arrive at a compensatory damages award of $100,000.

any loss from their hapless investments. True, the jury could have simply chosen to find liability only on the OTP investment. However, the jury was also free to measure out portions of the transactions to arrive at the $100,000 figure.

In addition, the jury's compensatory damages award does not represent an impermissible compromise verdict under the reasoning of *National Fire*. There is not enough evidence in the record to support Johnson's claim that the jury's decision was the result of compromise. *National Fire* concerned the refusal by a warehouse operator to compensate one of National's insureds for damages sustained when a fire at the facility destroyed its stored Kool-Aid, a soft drink concentrate. 261 F.2d at 37. The court regarded the cases as close and found the jury verdict represented exactly half of the damages sought. *Id.* We reasoned in that case:

> By its verdict the jury found that plaintiff was entitled to recover, yet it awarded only one-half of the amount of its loss as established by the undisputed evidence on this subject and under the court's instructions. It is absurd to say this is anything other than a compromise verdict and highly improper as a compromise, not only as to damages, but on the issue of liability.

*Id.* at 38. That did not occur in this case. The jury instructions did not mandate that the award for any particular liability finding on any specific investment had to be fixed at the amounts listed.[6] Also, whereas in *National Fire* there was no other rational explanation for how the jury could have arrived at the figure of one-half of the damages, here the possible explanations seem almost limitless.

---

[6] Recall, the actual jury instructions state that the jury could compensate the Kapelanskis for "any resulting loss" from their itemized investments with Johnson.

### 2. Punitive Damages

Johnson contends that the jury's punitive damage award of $331,250 is untenable because the jury's liability verdict is without evidentiary basis and is excessive. Because we have already found the liability verdict to be sound, we reject Johnson's first argument.

As for the alleged excessiveness of the punitive damages, Johnson cites *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). We review the district court's determination of the constitutionality of punitive damages *de novo. Cooper Indus., Inc. v. Leatherman Tool Group*, 532 U.S. 424, 436-37 (2001).

Under *BMW*, we consider three guideposts to determine whether a punitive damage award is grossly excessive such that it offends due process: (1) the degree of reprehensibility of defendant's conduct; (2) the disparity between the harm or potential harm suffered by the plaintiff and his punitive damages award; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *BMW*, 517 U.S. at 575. The award must also be consistent with Illinois state law to be valid in this diversity case. *See Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 106 F.3d 1388, 1397 (7th Cir. 1997) ("Illinois law governs the substantive assessment of whether the evidence supports the damages awarded when liability is based on Illinois law.") Illinois allows punitive damages to be awarded when "torts are committed with fraud, actual malice . . . or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill. 1998); *Home Sav. and Loan Ass'n of Joliet v. Schneider*, 483 N.E.2d 1225, 1228 (Ill. 1985) ("While deceit alone cannot support a punitive damage award, such damages may be allowed where the wrong involves some violation of duty springing from a relation of trust or confidence, or where the fraud is

gross, or the case presents other extraordinary or exceptional circumstances clearly showing malice and willfulness." (internal citations omitted)). Here, Johnson was found guilty of willfully defrauding the Kapelanskis for large sums of money.

Further, the punitive damage award of $331,250 represents a ratio of 3.3 to 1 which is easily permissible. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) (noting that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1."). *See also Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672 (7th Cir. 2003) (sustaining a punitive damages award with a ratio to compensatory damages of 37.2 to 1). Here, not only is our ratio a single digit, but a low one at that. We therefore find the punitive damage award to be sound both under federal and state law.

## C.  Questioning by the District Court

Johnson contends that he suffered prejudice when the district court questioned him on the stand in front of the jury. We review the propriety of judicial examination of a witness for abuse of discretion. *United States v. Martin*, 189 F.3d 547, 553 (7th Cir. 1999). While the defendant describes the questioning as a "hostile interrogation," the law on this point is reasonably clear. A judge has discretion under Federal Rule of Evidence 614(b) to question a witness. We have upheld the principle that a judge may question the defendant for the purposes of making the testimony clear for the jury. *See id.* at 553 (a district court "can question a witness in an effort to make the testimony clear for the jury"), so long as the judge does not advocate for either side or express any favoritism. *See also Ross v. Black & Decker, Inc.*, 977 F.2d 1178, 1187 (7th Cir. 1992). Here, the district court

only asked questions when Johnson did not answer questions as asked. The court intervened only to help guide the testimony. Furthermore, we find no prejudice to Johnson when the district court commented, outside the presence of the jury and after the jury returned its verdict, that Johnson was not a very credible witness.

## D.  Unfair Surprise

Finally, Johnson alleges unfair surprise due to the plaintiffs changing their theory about how Johnson accomplished the fraud during the trial. The Kapelanskis allegedly did this in violation of the final pre-trial order, which outlined the agreed upon statements of contested issues of fact and law. Johnson asserts that the Kapelanskis initially claimed that his attorneys gave him the $100,000 that the Kapelanskis intended to be invested in the OTP. Johnson asserts that at trial, the Kapelanskis argued a kickback theory, where Johnson's attorneys transferred the money to Russel Pierce who then returned it to Johnson. Johnson alleges that this change caused him prejudice, which can only be cured by a new trial.

Johnson's argument is unconvincing. Johnson was on notice that the trial was about his alleged fraud. Though the kickback theory was not explicitly in the final pre-trial order as among the "Agreed statements of contested issues of fact and law," the following statement, which was in the order, encompasses the kickback theory: "Whether or not the $100,000.00 paid on October 25, 1998 to JOHNSON was indeed invested in an offshore trading account for Plaintiffs' benefit." Whether Johnson himself took the money or did so with Pierce's help, both of these theories are consistent with the quoted language of the pre-trial order.

Johnson cites *Twigg v. Norton Co.*, 894 F.2d 672 (4th Cir. 1990) to support his claim. However, *Twigg* was a product liability case that concerned a change in the theory of lia-

bility. In *Twigg*, the machine at question was defective because it required a protective guard. Here, the Kapelanskis' kickback theory is simply an explanation of how the alleged fraud was accomplished, not the type of liability. There was no abuse of discretion when the trial court allowed the Kapelanskis to introduce the kickback theory to the jury.

### III. Conclusion

For the reasons discussed above, we AFFIRM the district court on all grounds.

A true Copy:

Teste:

_____
***Clerk of the United States Court of***
***Appeals for the Seventh Circuit***