In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 08-4028 & 08-4130

GEORGE "TOM" NEMSKY,

*Plaintiff-Appellant,*
*Cross-Appellee,*

*v.*

CONOCOPHILLIPS COMPANY,

*Defendant-Appellee,*

and

INTERNATIONAL UNION OF OPERATING
ENGINEERS, LOCAL 399,

*Defendant-Appellee,*
*Cross-Appellant.*

Appeals from the United States District Court
for the Southern District of Illinois.
No. 3:07-cv-00205-MJR-CJP—**Michael J. Reagan**, *Judge.*

ARGUED JUNE 4, 2009—DECIDED AUGUST 3, 2009

Before FLAUM, WOOD, and TINDER, *Circuit Judges.*

FLAUM, *Circuit Judge.* Plaintiff George "Tom" Nemsky brought a lawsuit against defendants ConocoPhillips and the International Union of Operating Engineers, Local 399, for breach of the defendants' Collective Bargaining Agreement and breach of the duty of fair representation, respectively. The district court granted summary judgment to defendants and Nemsky appeals that ruling. Local 399 also cross-appeals the district court's denial of Rule 11 sanctions against Nemsky. For the reasons explained below, we affirm the judgment of the district court in all respects.

## I. Background

### A. The Collective Bargaining Agreement and the 2004 Substance Abuse Policy

Nemsky worked as an operating engineer at ConocoPhillips's Wood River Refinery. The operating engineers at Wood River were represented by the International Union of Operating Engineers, Local 399. Local 399 and ConocoPhillips had a Collective Bargaining Agreement ("CBA") that governed the relationship between union members and ConocoPhillips. Article 20 of the CBA stated that a represented employee "may be disciplined, including discharge, only for just cause." Article 20 also provided that, if, after compliance with normal discipline grievance procedures, a "complaint [against ConocoPhillips] is not settled in a satisfactory manner," Local 399 "may submit the complaint to arbitration." The CBA stated that, when arbitration is initiated,

"it is understood and agreed that the arbitrator shall determine whether the Company had just cause for discipline."

Article 21 of the CBA stated that ConocoPhillips could make rules and regulations "from time to time . . . which will not be in conflict with anything contained in this Agreement." Purportedly pursuant to the rule-making authority outlined in Article 21, in 2004, ConocoPhillips implemented a revised substance abuse policy for all of its North American employees (the "2004 SAP"). The 2004 SAP provided for random drug and alcohol testing for all employees, including those at the Wood River Refinery. The 2004 SAP also stated that it was a violation of the policy for employees to report for or remain on duty if there were "any detectable trace amount" of alcohol in their systems. The guidelines implementing the policy defined "detectable trace amount" as a blood alcohol content of 0.040 or greater. Under the 2004 SAP, the "consequence of any confirmed positive test result [was] termination."

After the 2004 SAP was promulgated, Local 399, along with the nine craft unions also represented at the Wood River Refinery, filed a collective grievance regarding ConocoPhillips's unilateral implementation of the revised policy. Local 399 wished to arbitrate the issue. However, ConocoPhillips maintained that the 2004 SAP was issued pursuant to its Article 21 rule-making authority, that it was not part of the CBA, and that issues arising from it were not subject to the CBA's grievance procedure. ConocoPhillips indicated that it would not submit to arbitration unless the union agreed

that it could seek de novo court review of the policy's substantive arbitrability, if necessary.

In addition to the collective grievance, on September 30, 2004, Local 399 filed an unfair labor practice charge with the National Labor Relations Board ("the NLRB") regarding ConocoPhillips's allegedly unlawful implementation of the 2004 SAP. The NLRB Regional Office dismissed the charge by letter on December 22, 2004 and an NLRB agent advised George Machino, the business representative of Local 399, of the futility of an appeal. Machino testified that he had expected the NLRB to defer the unfair labor practice charge to arbitration and when that did not happen he concluded that the NLRB agreed with ConocoPhillips that issues arising under the 2004 SAP were not arbitrable. Machino also testified that, around the time the NLRB filing was dismissed, he knew that no ConocoPhillips union in the country had been successful with grievances or unfair labor practices charges resisting ConocoPhillips's new SAP. Floyd Fessler, Local 399's business agent, likewise gave testimony that Local 399 believed its options with regard to the 2004 SAP were weak.

Machino testified that, with these concerns in mind, Local 399 made "a conscious decision . . . to get the best deal that [it] could get on behalf of the [union] members." Accordingly, Local 399 dropped its challenge to the 2004 SAP by entering into a "Memorandum of Agreement" (the "MOA") with ConocoPhillips on January 27, 2005. The MOA stated that a "confirmed positive test" under the SAP "shall be cause for immediate termination and such termination shall not be subject to the grievance and

arbitration provisions of the Collective Bargaining Agreement." However, the MOA also stated that Local 399 "continues to maintain the right to grieve and arbitrate the integrity of the chain of custody process of the policy."

At his deposition, Machino expressed satisfaction with Local 399's retention of the ability to grieve chain of custody issues. Machino testified that, as far as he was aware, Local 399 was the "only union in the country that got any movement whatsoever in this policy" and stated that he viewed the retention of Local 399's right to grieve chain of custody issues as "gaining a right for Wood River employees that no other [ConocoPhillips] employees had."

## B. Nemsky's Termination

At the time of his termination, Nemsky had worked as an operating engineer for the Wood River Refinery for twenty-two years and had a history of solid work performance. As an operating engineer, he occupied a safety-sensitive post; one of his duties was to ensure that areas of the refinery were cleared of combustible material so as to minimize the possibility of an explosion at the refinery.

Nemsky reported to work on September 20, 2006 (a Wednesday) at 6:45 am. While working that morning, he inadvertently kicked over a can of pipe cement and got cement on his coveralls and shoe. He went to the restroom and used a solvent to remove the pipe cement. During the process of removing the cement, Nemsky was within a small unvented space and he began to feel light-headed.

After Nemsky left the restroom, he received a call from his supervisor informing him that he had been selected for a random drug and alcohol test pursuant to the SAP. Nemsky proceeded to the medical office for testing, where Nurse Pat Diener administered his first alcohol test around 7:45 am. Diener testified that Nemsky was fully cooperative through all testing. Prior to conducting the test, Nemsky told Diener that he had taken Robitussin immediately prior to reporting for work, but Diener was apparently unconcerned that this would taint the test. Nurse Diener used an Intoximeter handheld breath test device to conduct the alcohol testing. The first test given to Nemsky returned a 0.043 blood alcohol level, a result which qualified as a "detectable trace amount" of alcohol under the 2004 SAP. After the first test, the testing instrument automatically ran a "blank." The "blank" test registered a 0.000 alcohol level, indicating that there was no residual alcohol in the testing equipment. After a fifteen minute wait, Diener gave Nemsky a second test. which showed a blood alcohol level of 0.044. After the second test, the testing instrument automatically required a calibration check. Diener conducted the calibration check using a standard canister of gas known to have an alcohol content of 0.037. Although the Intoximeter device is considered to be in proper working condition if the test measures within .005 of the known standard, the calibration check registered precisely at the level of the known standard, 0.037, without any measurable deviation.

After the second test, Nemsky called union official Floyd Fessler and told him that he had failed an alcohol

test. Fessler told him to get a blood test as quickly as possible. Shortly after speaking with Fessler, Nemsky told ConocoPhillips medical office personnel that he needed to leave. Medical staff told him he could not drive because he was impaired, but offered to get a cab for him. Nemsky declined the cab.

Medical personnel gave Nemsky two additional breath tests at 8:40 am and 9:56 am, which returned results of 0.026 and 0.000 respectively. Between these third and fourth tests, Nurse Diener conducted another calibration check, which again produced the accurate result of 0.037.

Plaintiff argues that the breath tests were false positives. However, he admitted at deposition that he consumed between two and four beers the evening of September 19, 2006 (the night before his blood alcohol tests). Moreover, Machino testified that Nemsky told him two different stories regarding his consumption of alcohol the night before the positive tests. Machino testified that about a week after the positive alcohol tests, Nemsky told him that he had "two tall mugs of beer at the bar after work and went home and may have had a couple there." A week or so after that, Nemsky supposedly told Machino that "he had a few beers after work, and you know how it is in a bar when they start buying you drinks. There may have been a few shots in there."[1]

---

[1] Machino's testimony regarding plaintiff's statements to him are the statements of a party-opponent, which are not hearsay. *See* Fed. R. Evid. 801(d)(2).

By certified letter dated September 22, 2006, ConocoPhillips informed Nemsky that his employment was terminated. On September 25, 2006, Nemsky asked Local 399 to "contest my discharge per Article 20" of the CBA. Local 399 sent at least two letters to ConocoPhillips stating that the union believed Nemsky's termination "lack[ed] just cause" and indicating its intent to proceed to arbitration. By February 2007, Local 399 and ConocoPhillips had each designated their representatives for arbitration, yet no arbitration was ever held.

Nemsky filed suit with the NLRB against Local 399 and ConocoPhillips on March 21, 2007, complaining that the defendants had not followed through with arbitration.[2] Fessler later testified that he was "not certain" why arbitration had not occurred. Machino testified that Local 399 stopped processing Nemsky's arbitration at least in part because Nemsky filed charges against the union with the NLRB.

Nemsky filed a federal law suit in the Southern District of Illinois. He alleged that ConocoPhillips had breached the CBA and that Local 399 had breached the duty of fair representation. ConocoPhillips and Local 399 filed motions for summary judgment and Local 399 also asked for Rule 11 sanctions against Nemsky. The district court granted summary judgment to both defendants but denied the motion for sanctions. Nemsky appeals the

---

[2] The parties' briefs do not indicate the outcome of these charges.

grant of summary judgment to defendants and Local 399 cross-appeals the denial of Rule 11 sanctions.

## II.  Discussion

We review the district court's grant of summary judgment to defendants de novo. *See Crider v. Spectrulite Consortium*, 130 F.3d 1238, 1241 (7th Cir. 1997). Summary judgment is proper where "there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Nemsky filed his claim against Local 399 and ConocoPhillips under Section 301 of the Labor Management Relations Act. *See* 29 U.S.C. § 185. That section gives federal courts jurisdiction over suits to enforce the terms of collective bargaining agreements. *Id.* Nemsky's claim is a so-called "hybrid 301" action because he has sued Local 399 for breaching its duty of fair representation and his employer for breaching the collective bargaining agreement. *Crider*, 130 F.3d at 1241 (citing *Ooley v. Schwitzer Div., Household Manufacturing., Inc.*, 961 F.2d 1293, 1297-98 (7th Cir. 1992)). These two parts of Nemsky's claim are "inextricably interdependent": he must establish both parts of his hybrid claim in order to prevail. *McLeod v. Arrow Marine Transp., Inc.*, 258 F.3d 608, 613 (7th Cir. 2001) (citing *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164-65 (1983)). "[N]either claim is viable if the other fails." *Crider*, 130 F.3d at 1241 (citing *White v. General Motors*, 1 F.3d 593, 595 (7th Cir. 1993)).

**A. Duty of Fair Representation**

The first part of Nemsky's hybrid suit is his claim against Local 399 for breach of the duty of fair representation.

"'National labor policy has been built on the premise that by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining . . . .'" *McLeod*, 258 F.3d at 612-613 (quoting *NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180 (1967)). However, when individuals join together, "the complete satisfaction of all who are represented is hardly to be expected." *Id.* (quoting *Allis-Chalmers*, 388 U.S. at 180). Nonetheless, employees are bound by the union's actions. *See id.* To balance the power bestowed upon a union to exclusively represent all employees in employment disputes, "'a concomitant duty of fair representation [is owed by the union] to each of its members.'" *Id.* (quoting *Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1176 (7th Cir. 1995)).

A union breaches its duty to fairly represent a member where its conduct toward a member is "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190 (1967); *Crider*, 130 F.3d 1238, 1243. Each of these possibilities are considered separately in determining whether a breach has occurred. *Id.* (citation omitted).

Nemsky argues that the union acted arbitrarily by entering into the MOA, which settled the union's claims against ConocoPhillips arising out of the company's enactment of the 2004 SAP. He claims that when Local 399

agreed to the MOA, it "surrender[ed] the right of all employees to ever again arbitrate a termination of employment for an alleged violation fo the Substance Abuse Policy" and that this decision was "downright irrational." He alleges that Local 399's motivation for "caving in" to the company was its desire to obtain reinstatement of two employees who had been terminated for alleged violations of the SAP, a trade-off that Nemsky again characterizes as "irrational." Finally, Nemsky rejects the notion that the union obtained a concession from ConocoPhillips by maintaining the right to grieve "chain of custody" issues with regard to the 2004 SAP. Rather, he believes that this clause only gave the union a right to grieve a narrow class of cases and that the union's belief "that [the union] got something when the company agreed to comply with legal requirements regarding 'chain of custody' only reinforces the conclusion that the union acted arbitrarily and irrationally when it gave away the critical 'just cause' protections."

This court has described the test test for determining whether a union's conduct is arbitrary as "quite forgiving." *See Garcia*, 58 F.3d at 1176; *accord McLeod*, 258 F.3d at 613. Indeed, a union's actions will only be deemed arbitrary if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior "is so far outside a wide range of reasonableness, 'as to be irrational.'" *Id.* (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)) (additional citations omitted).

We agree with the district court that no rational jury could find that the union was "irrational" under this highly deferential standard. At the time Local 399 signed

the MOA, its unfair labor practice claims regarding the 2004 SAP had been dismissed by the NLRB, an NLRB agent had informed a union official that an appeal would be futile, and no other ConocoPhillips union in the country had succeeded in challenging the policy. It also bears noting that, at the time Local 399 signed the MOA, the union was aware that the Third Circuit Court of Appeals had recently upheld a refinery's unilateral imposition of a national "zero tolerance" drug and alcohol policy based on the employer's contractual right to promulgate disciplinary rules. *See CITGO Asphalt Refinery Co. v. Local 2-991*, 385 F.3d 809 (3d Cir. 2004). While we cannot pass on the wisdom of the union's abandonment of its challenge to the 2004 SAP and concomitant agreement to the MOA, the circumstances described above show that the union's execution of the MOA was not arbitrary or irrational.[3]

---

[3] Moreover, although we look only to "the legal landscape at the time" of the union's decision to determine arbitrariness, *see O'Neill*, 499 U.S. at 799, nothing precludes our use of hindsight to confirm the correctness of factors considered by Local 399 when it decided to sign the MOA. As mentioned, after Local 399 signed the MOA, a ConocoPhillips union in Texas challenged the SAP in two arbitrations and lost both. The arbitrators in those cases specifically found that ConocoPhillips had the authority under the CBA to unilaterally revise the SAP to reflect that an employee could be discharged if he tested positive, even one time, on a random drug test. Though we express no opinion regarding the correctness of these results, they provide further support for Local 399's decision to enter into the MOA.

Although his argument is less than cogent on this point, Nemsky also seems to argue that the union abandoned the arbitration of his termination in bad faith. *See Vaca*, 386 U.S. at 190. Specifically, Nemsky argues that Local 399 abandoned the arbitration of his termination in retaliation for his filing of charges against the union in the NLRB.

A union's failure or refusal to arbitrate a grievance because a member files charges against it is a breach of the duty of fair representation. *See* 29 U.S.C. § 411(a)(4) ("No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency."); *see also NLRB v. Industrial Union of Marine & Shipbuilding Workers*, 391 U.S. 418, 424 (1968) ("[T]here should be as great a freedom to ask the Board for relief as there is to petition any other department of government for a redress of grievances. Any coercion used to discourage, retard, or defeat that access is beyond the legitimate interests of a labor organization."); *Kesner v. NLRB*, 532 F.2d 1169, 1175 (7th Cir. 1976), *cert. denied*, 429 U.S. 1022 (1976) (holding that once a union has decided to take a grievance to arbitration, it breaches the duty of fair representation if it then fails to "fully and fairly advocat[e]" on behalf of grievant). Unlike the arbitrariness inquiry, which looks to the objective adequacy of the union's conduct, the bad faith analysis focus on the subjective motivation of union officials. *Crider*, 130 F.3d at 1243 (citing *Trnka v. Local Union No. 688*, 30 F.3d 60, 63 (7th Cir. 1994)).

As noted above, in February 2007, the union informed ConocoPhillips that it believed Nemsky's termination

"lack[ed] just cause" and indicated an intent to proceed to arbitration. Despite their current litigation position that Nemsky's termination could not be grieved or arbitrated, it is undisputed that by the end of February 2007, Local 399 and ConocoPhillips had each designated representatives for the purpose of moving forward with arbitration of the grievance. But no arbitration was ultimately held. Fessler testified that he "[was] not certain" why the arbitration had not occurred, while Machino testified: "quite frankly, it got stopped when [Nemsky] filed the charges against us" with the NLRB. Nemsky argues that Machino's testimony shows that the union failed to arbitrate his grievance in retaliation for the charges he filed against the union with the NLRB.

Machino's deposition testimony provides strong evidence in Nemsky's favor in this regard. Machino testified as follows:

> Q.  Is there any other reason other than the fact that he didn't go to the hospital that the union didn't push his termination to arbitration?
>
> A.  Any other reasons. Well, quite frankly, it got stopped when he filed the charges against us for not doing it, and it was pending at the time.
>
> Q.  So why would the fact he filed a Section 301 claim against the union stop the union from arbitrating his termination?
>
> . . . .
>
> A.  He took the position that we weren't going to.

Q.  So why would that stop you? If he took the position that the Cubs are a better baseball team than the Cardinals, why—that wouldn't stop it?

A.  It was stopped on the basis we didn't feel we had a case because he didn't comply. And at that point, he quit communicating with us in regards to—he took the position we weren't going to do it, so we were kind of out of bounds at that point in time.

The district court concluded from this testimony that the union abandoned the arbitration of Nemsky's termination "because (1) the Union felt it had no case since Nemsky did not comply with Fessler's urging that he have a blood test; and (2) Nemsky stopped communicating with the Union because he took the position that the Union was not going to arbitrate the issue." But we respectfully submit that the district court's reading does not take note of a third reason that emerges from Machino's testimony: that the union stopped pursuing arbitration because Nemsky filed charges against it, as Machino stated in response to the first question excerpted above. Machino's statement in this regard is direct evidence of Local 399's alleged motivation for the abandonment, and would be sufficient to preclude summary judgment on this aspect of Nemsky's claim.

## B.  Whether ConocoPhillips Breached the CBA

As noted above, in a "hybrid 301" claim, the employee's claim against the union and his claim against the employer are linked: "neither claim is viable if the

other fails." *Crider*, 130 F.3d at 1241 (citing *White v. General Motors*, 1 F.3d 593, 595 (7th Cir. 1993)). Here, Nemsky provided evidence that the union breached the duty of fair representation when it failed to arbitrate his grievance. So we next inquire into the second part of Nemsky's hybrid claim: whether ConocoPhillips breached the CBA.[4]

Neither party disputes that Nemsky was terminated because of a confirmed positive alcohol test conducted pursuant to the 2004 SAP. But plaintiff asserts that ConocoPhillips's enactment of the 2004 SAP breached the CBA. He points out that the 2004 SAP stated that "the consequence of any confirmed positive test result will be termination," while the CBA required that a termination be supported by just cause. This argument has some appeal, as the CBA and 2004 SAP are certainly in tension in this regard. Plaintiff's argument fails, however, because

---

[4] Plaintiff argues that an employee suing his union under Section 301 for breach of the duty of fair representation *in negotiations* need not prove that his employer breached the CBA (although he admits that he must prove a breach of the CBA if his fair representation claim hinges on the union's alleged failure to arbitrate). Because plaintiff has not shown that the union breached its duty of fair representation in negotiating the MOA (as explained, *supra*), plaintiff's contention that he need not prove a violation of the CBA in this particular context is not relevant. However, even if we were to consider that argument, plaintiff provides no case law or other authority to support his suggestion that we recognize an exception to settled precedent in these circumstances. We thus reject Nemsky's argument as without merit.

the union put any objections to the 2004 SAP aside when it entered into the MOA in early 2005. The MOA essentially operated as an amendment to the CBA and any claim that ConocoPhillips breached the CBA was resolved when the union entered into that agreement. Nemsky has advanced no other viable breach of contract theory, and his hybrid claim therefore cannot succeed.

## C. Is Plaintiff Entitled to "Some Forum?"

Plaintiff's final argument is that, despite the union's agreement to the MOA, he "must be afforded an alternative venue to enforce the remaining 'just cause' provision" in the CBA. Nemsky cites *McNealy v. Caterpillar*, 139 F.3d 1113 (7th Cir. 1998) for the proposition that "to have any reality the 'just cause' provision must be subject to a 'neutral review of the firing decision.'" Nemsky is correct that if he had the right to a just cause inquiry, *McNealy* suggests he had the right to neutral review under that provision. But Nemsky did not have the right to a just cause inquiry: "just cause" is not a constitutional or even a statutory right; rather it is a contractual right to be decided and governed by the bargaining between the parties. Here, the union decided to give up its challenge to the 2004 SAP, which provided for termination without a just cause inquiry, and to sign the MOA, which explicitly recognized that those terminated under the 2004 SAP could only grieve chain of custody issues. Because Nemsky was fired in accordance with the terms of the 2004 SAP and the MOA, he does not have the right to a just cause inquiry.

**D. Rule 11 Sanctions**

Local 399 moved for Rule 11 sanctions against Nemsky, which the district court denied. Local 399 now cross-appeals the denial of sanctions. We review a district court's denial of Rule 11 sanctions for abuse of discretion. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990).

Local 399 presents a convoluted argument for sanctions. It points out that Nemsky's complaint originally alleged that the MOA was the result of a secret deal between ConocoPhillips and the union. Nemsky's counsel later stated in an affidavit, in response to ConocoPhillips's motion for summary judgment, that he believed his theory of a secret deal would be borne out by the depositions of Patricia Diener, the nurse who administered the breath tests, and Jay Hawley, ConocoPhillips's designated corporate representative. According to Local 399, depositions were taken on February 28 and 29, 2008, during which Jay Hawley was present and available to be deposed. However, Nemsky's counsel never took Hawley's deposition. Local 399 argues that Nemsky's counsel's failure to take Hawley's deposition was "objective conduct, consistent with the subjective conclusion that, considering the depositions taken on February 28 and 29 and the documents produced by Local 399 showing there was no 'secret deal,' plaintiff's counsel concluded Hawley's deposition would be a waste of time and money." Local 399 argues that, having concluded that there was no "secret deal," plaintiff was obligated to dismiss his action.

The chain of inferences Local 399 asks this court to make in order to conclude that Nemsky should have

dismissed his action at an earlier date can be described as speculative at best. Local 399 has not shown that Nemsky litigated in bad faith or that he advanced a frivolous claim. It certainly has not shown that the district court abused its discretion in denying sanctions. We affirm in this regard.

### III.  Conclusion

Nemsky provided evidence that the union failed to arbitrate his grievance in good faith and thus breached its duty of fair representation. However, plaintiff did not provide evidence that ConocoPhillips breached the CBA. Nemsky was required to establish sufficient evidence of both claims in order to proceed to trial on his hybrid suit. We therefore AFFIRM the district court's grant of summary judgment. We also AFFIRM the district court's denial of Rule 11 sanctions to Local 399.