Patricia RUPCICH, Plaintiff–
Appellant,

v.

UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, Local 881, and Jewel Food Stores, Inc., Defendants–Appellees.

No. 14-3377

United States Court of Appeals,
Seventh Circuit.

Argued October 27, 2015

Decided August 17, 2016

Rehearing and Rehearing En Banc Denied September 26, 2016

Neal C. Zazove, Attorney, Zazove & Associates, Chicago, IL, for Plaintiff–Appellant.

Jonathan D. Karmel, Attorney, Karmel Law Firm, Chicago, IL, for Defendant–Appellee United Food and Commercial Workers International Union, Local 881.

Michael A. Warner, Jr., Attorney, Franczek Radelet P.C., Chicago, IL, for Defendant–Appellee Jewel Food Stores, Inc.

Before KANNE and ROVNER, Circuit Judges, and BRUCE, District Judge. *

KANNE, Circuit Judge.

Plaintiff Patricia Rupcich was fired from her job of twenty-five years at one of Defendant Jewel Food Stores, Inc.'s stores in January 2012 for wheeling a twenty-five pound bag of birdseed in a grocery cart past the last cash register without paying for it. Rupcich said that she wheeled the birdseed past the last cash register by accident, as she rushed home to care for her sick grandson after her shift ended. That this may in fact be true is irrelevant, according to Jewel, because it claims to define "misappropriation" and theft to be strict liability violations that do not require a showing of intent. Of course, there does not appear to be evidence that Jewel communicated this definition to Rupcich. There is evidence, however, that it relayed this information to Rupcich's union, Defendant United Food and Commercial Workers International, Local 881, which decided not to dispute her termination with Jewel in arbitration or even process it through the collectively bargained grievance procedure. Instead, Local 881 abandoned her case because Rupcich admitted she took the bag of birdseed past the last cash register in her store without paying for it. Local 881 made this decision despite substantial evidence that Rupcich had made

* The Honorable Colin S. Bruce, of the United States District Court for the Central District of Illinois, sitting by designation.

an inadvertent mistake in her rush to get her grandson to the doctor.

Rupcich filed this complaint alleging amongst other theories that Local 881 breached its duty of fair representation to her and that Jewel breached the relevant collective bargaining agreement.[1] The parties cross-moved for summary judgment, with Local 881 arguing that the great amount of deference afforded unions under federal labor law shielded any questionable decisions it may have made in declining to pursue Rupcich's grievance. The district court agreed, and on that basis, granted Local 881 and Jewel's motions for summary judgment on the breach of fair duty of representation claim and breach of contract claim, respectively. It denied Rupcich's motions for summary judgment.

Rupcich appeals the district court's decisions on her claims for breach of the duty of fair representation and breach of the collective bargaining agreement. Finding that a reasonable juror could determine that Local 881's actions in this case were arbitrary and outside the "wide range of reasonableness" afforded unions in the grievance process, see Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991) (internal quotation marks omitted), we reverse the district court's decision granting summary judgment to Local 881 and Jewel on Rupcich's claims against them. We do, however, affirm the district court's decision to deny Rupcich's motions for summary judgment.

## I. BACKGROUND

### A. Factual Background

Rupcich worked for a Jewel grocery store in Chicago's East Side neighborhood from November 1986 until her termination on January 31, 2012. During her twenty-five year tenure as a Jewel employee, Rupcich was also a member of Local 881. Local 881 had negotiated a collective bargaining agreement with Jewel entitled "Local 881 UFCW Contract 2010-2013 Jewel Food Stores, Inc. Chicagoland" ("CBA"), which governed Rupcich and other Jewel employees' relationship with Local 881 and Jewel. This CBA was in effect at the time of Rupcich's dismissal from Jewel.

On January 19, 2012, Rupcich was performing her duties as a receiving clerk at the East Side Jewel when she received a call from her husband around 12:15 p.m. Rupcich's husband, who had been babysitting their grandchildren while she worked that day, called Rupcich to tell her that her grandson was ill and to ask for her to come home immediately to help. After speaking with her daughter—the child's mother—regarding the situation, Rupcich decided to finish her shift, which ended at 1 p.m. Rupcich planned to go home, pick up her grandson, and take him to a doctor's office around 2 p.m.

During her shift that day, Rupcich had been cleaning the receiving area and came across two bags of birdseed. Rupcich scanned one bag and discarded it as damaged; as for the other bag, Rupcich placed it in the shopping cart. According to Rupcich, she planned to return the bag of birdseed to the front of the store as she left for the day. Rupcich said it was her practice to bring overstock items like the bag of birdseed to the front of the store. Rupcich packed up her personal belongings—her winter attire, her coffee cup, the lunch she paid for at Jewel, and a receipt for the lunch—and placed them in the cart's child seat. The birdseed bag was in the cart's main carriage.

---

1. Rupcich also alleged state defamation claims against Jewel. The district court granted Jewel's motion for summary judgment on those claims. Rupcich does not appeal that decision.

After clocking out at the front of the store, Rupcich rolled the shopping cart with her personal belongings and birdseed bag past the last point of sale and headed to the exit where Jewel Loss Prevention Associate Gregory Young was standing. Young asked to see Rupcich's receipt for the birdseed bag, which, according to Young, was not concealed. Rupcich testified she realized her mistake, apologized, explained to Young that her grandson was sick, and wheeled the cart with the birdseed to the wall by the service desk and self-checkout. Young told Rupcich he would have to report the incident to his supervisor. According to Young, he made this report even though he did not believe that Rupcich intended to steal the birdseed. After their brief conversation, Rupcich proceeded home and took her grandson to the doctor.

Young informed his supervisors, including Jewel Loss Prevention Manager Marty Oppenhauser, of the incident. He also completed a Security/Loss Prevention Incident Report in which he recounted the incident. In the account, Young states that Rupcich told him she had forgotten about the birdseed and that it was overstock.

Oppenhauser was directed to investigate the January 19 incident. According to Oppenhauser, he viewed a video showing Rupcich's movements from the receiving area to the front and filled out a "Digital Video Evidence Log" recounting meaningful events in Rupcich's journey. On January 23, 2012, Oppenhauser interviewed Rupcich. Rupcich provided an account substantially similar to the one discussed above. A decision was then made to suspend Rupcich until further review.

Rupcich contacted her Union representative, Marcella Robinson, the same day to report the suspension and provide her version of events. Robinson told Rupcich that she would attempt to determine the status of Rupcich's case. Robinson then contacted Rupcich's store manager, Raymond Ulatowski. The two had a brief conversation in which Ulatowski did not provide any information on Rupcich's case and directed Robinson to contact Jewel's loss prevention department. Robinson then proceeded to file a grievance on Rupcich's behalf and sent a letter to Jewel seeking security reports, video, and any other documentation related to Rupcich's suspension.

After his meeting with Rupcich, Oppenhauser forwarded the information he gathered from his investigation to his superiors. Those investigative results included: (1) Oppenhauser's memorandum summarizing his interview with Rupcich; (2) Rupcich's written statement; (3) Oppenhauser's video log; and (4) Young's report. Oppenhauser did not interview Young or anyone else from the store who may have known Rupcich or witnessed the January 19 incident.

John Novosel, a Jewel associate relations representative, reviewed that investigative file and the video of the incident before making the determination to terminate Rupcich. In making this determination, Novosel relied on Jewel's "strict[ly] enforc[ed]" misappropriation policy, which, according to Novosel, operates under the following strictures: (1) any taking of unpaid for merchandise past the last point of sale—the last cash register or self-checkout terminal—is considered "theft" under the policy; (2) it is Jewel's policy to terminate anyone who violates the policy, unless "special or mitigating circumstances exist"; (3) an "employee's intent or state of mind" in taking that unpaid merchandise past the point of sale is irrelevant in enforcing Jewel's misappropriation policy; and (4) "forgetting to pay for product" is not a "special or mitigating circumstance" under the policy. Novosel concluded that the video showed Rupcich walk past the final point of sale with unpaid merchandise in her

cart and that her explanation for doing so did not qualify as a "special or mitigating circumstance." After making this decision, Novosel prepared an "Associate Corrective Action Review," which memorialized his decision to terminate Rupcich for "[m]isappropriation of Company property."

Following Novosel's decision, Jewel contacted Rupcich and asked her to attend a meeting on January 31. Rupcich contacted Robinson who went with Rupcich to the meeting. At the meeting, Ulatowski told Rupcich that Jewel had decided to terminate her employment and asked her to sign the "Associate Corrective Action Review." On Robinson's advice, Rupcich refused to sign the form.

On February 4, Jewel denied Rupcich's previously filed grievance, which prompted Robinson to meet with the Union's Grievance Coordinator, Bill O'Keefe, to discuss the Union's next steps. O'Keefe and Robinson reviewed the investigative file, which included video stills showing Rupcich being stopped by store security past the point of sale, Rupcich's statement, and a document entitled "Security/Loss Prevention Detailed Case Report" that states Rupcich's offense was "Misappropriation" and her offense category was "Dishonesty/Criminal Acts." It is undisputed that Jewel did not provide the Union the video of the incident, just photo stills. O'Keefe and Robinson also discussed Rupcich's statements to Robinson. O'Keefe decided not to pursue arbitration based on "Jewel's well-established practice of terminating employees who are stopped past the point of purchase with unpaid merchandise." Rupcich was subsequently informed that the Union would not be pursuing her grievance.

Rupcich and her attorney appealed O'Keefe's decision to the Union's Executive Board. Included in their appeal was: (1) a doctor's note indicating that Rupcich's grandson had been seen by a doctor for difficulty breathing on January 19, 2012, and (2) a signed statement from a clerk in the Thornton Police Department indicating Rupcich had informed the department she could not perform her duties as a crossing guard on the afternoon of January 19 because "her grandson had a respiratory emergency." The Executive Board denied her appeal.

### B. Procedural Posture

On August 17, 2012, Rupcich filed a complaint against the Union and Jewel alleging that: (1) the Union breached its duty of fair representation pursuant to section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185; and (2) Jewel breached the CBA in place between it and the Union. Rupcich filed an amended complaint in January 2013, adding claims for defamation *per se* and defamation *per quod* against Jewel.

The parties filed cross-motions for summary judgment in October 2013. In September 2014, the district court granted the Union's motion for summary judgment on the fair-representation claim and Jewel's motion on the defamation claim claims and breach of the CBA claim. In ruling for the Union, the district court concluded the evidence did not demonstrate that the Union acted in an arbitrary manner in deciding not to pursue Rupcich's arbitration claim. It then found that because her claim against the union failed, her claim against Jewel for breach of the CBA failed as well. This appeal followed.

## II. ANALYSIS

Rupcich advances two arguments on appeal. First, the district court erred in granting summary judgment in the Union's favor on the fair-representation claim because the Union acted arbitrarily in failing to follow the CBA's grievance procedure and in declining to pursue Rupcich's grievance to arbitration. Second, the dis-

trict court erred in granting summary judgment for Jewel and declining to grant her summary judgment on the breach-of-contract claim in light of the undisputed evidence that Rupcich accidentally kept the birdseed in her cart when she left her shift to tend to a family emergency.

We review a district court's decision to grant summary judgment *de novo*. *Nemsky v. ConocoPhillips Co.*, 574 F.3d 859, 864 (7th Cir. 2009). In reviewing a decision following cross-motions for summary judgment, "our review of the record requires that we construe all inferences in favor of the party against whom the motion under consideration is made." *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998). We affirm summary judgment only when our review of the record reveals "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate then "if, on the evidence presented, no reasonable juror could return a verdict in [the non-moving party's] favor." *Sorensen v. WD–40 Co.*, 792 F.3d 712, 722 (7th Cir. 2015).

Rupcich filed suit against the Union and Jewel under Section 301 of the LMRA, which grants federal courts jurisdiction to enforce collective bargaining agreements. *See* 29 U.S.C. § 185. Rupcich's suit is often referred to as a "hybrid 301" action because she has alleged that her Union breached its duty of fair representation and that her employer breached the CBA. *See Nemsky*, 574 F.3d at 864. The "two claims are inextricably interdependent. To prevail against either the company or the Union, [Rupcich] must not only show that [her] discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union." *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164–65, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) (internal quotation marks omitted). If one claim fails, "neither claim is viable." *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1241 (7th Cir. 1997).

### A. Breach of the Duty of Fair Representation

A union is the "exclusive bargaining representative" for its members and, as such, has a duty "fairly to represent" all of them, "both in its collective bargaining with [an employer] and in its enforcement of the resulting collective bargaining agreement." *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) (citations omitted). The union's duty of fair representation extends to its negotiations with an employer concerning an "employee's terms and conditions of employment, and provisions for processing his grievances." *NLRB v. Allis–Chalmers Mfg. Co.*, 388 U.S. 175, 180, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967) (footnote omitted).

An "employee may disagree with many of the union decisions but is bound by them. The majority-rule concept is today unquestionably at the center of our federal labor policy. The complete satisfaction of all who are represented is hardly to be expected." *Id.* (internal quotation marks omitted) (footnote omitted)). That is why "[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." *Id.* (internal quotation marks omitted). With these principles in mind, the Supreme Court has long held that "a union breaches its duty of fair representation if its actions are either arbitrary, discriminatory, or in bad faith." *O'Neill*, 499 U.S. at 67, 111 S.Ct. 1127 (internal quotation marks omitted) (citing *Vaca*, 386 U.S. at 190, 87 S.Ct. 903). The duty is "thus akin to the duty owed by other fiduciaries

to their beneficiaries." *Id.* at 74, 111 S.Ct. 1127.

Rupcich argues that the Union's actions in her case were arbitrary and in bad faith, but not discriminatory. We analyze the Union's actions under those two elements of the tripartite standard, keeping in mind that Rupcich need only "proffer evidence supporting at least one of these elements" to survive summary judgment. *Filippo v. N. Ind. Pub. Serv. Corp.*, 141 F.3d 744, 749 (7th Cir. 1998).

### 1. Arbitrary

■■■ The Supreme Court has held that a "union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness, as to be irrational." *O'Neill*, 499 U.S. at 67, 111 S.Ct. 1127 (citation and internal quotation marks omitted). Determining whether a union's actions are arbitrary under this standard requires "an objective inquiry." *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003). "In applying this extremely deferential standard, we will not substitute [our] judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call." *McKelvin v. E.J. Brach Corp.*, 124 F.3d 864, 867 (7th Cir. 1997) (alteration in original) (quoting *Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1176 (7th Cir. 1995)). That is why we require a plaintiff making out such a claim to prove: (1) that her "position is [not just] as plausible as the union's, but to show that the union's position could eventually be deemed not even colorable." *id.* at 868 (internal quotation marks omitted), and (2) that she "was actually harmed by the union's actions," that is, she must demonstrate "the outcome ... would probably have been different but for the union's activities," *Garcia*, 58 F.3d at 1176. The union need not be the only cause, as the

employer is often a culpable party in such cases, too. Rather, the union's actions must at least probably be a substantial factor in causing the plaintiff's injuries.

■■■ Local 881's position appears to be that the "broad authority" granted to unions is absolute in handling grievance matters. *See id.* at 1175. It is not. Even "a wide range of reasonableness" has bounds, and in this case, a reasonable juror could find Local 881 has exceeded them in two ways. There is sufficient evidence for a reasonable juror to find that Local 881: (1) ignored the plain language of the CBA's grievance policy and Rupcich's contractual rights in processing her grievance, and (2) handled a "substantively similar grievance[ ] differently from" Rupcich's, *see Trnka v. Local Union No. 688, United Auto., Aerospace & Agric. Implement Workers of Am.*, 30 F.3d 60, 61 (7th Cir. 1994). Rupcich has also offered enough evidence for a reasonable juror to conclude that she may have kept her job had Local 881 processed her grievance in accordance with the procedure and pursued her claim in arbitration.

■■■ We start with the language of the grievance policy contained in the CBA and Local 881's application of it, or more properly stated, its disregard for it. Determining whether a provision in a collective bargaining agreement is unambiguous is a question of law as is interpreting what that provision means. *Bennett v. Local Union No. 66, Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union, AFL–CIO, CLC*, 958 F.2d 1429, 1434 (7th Cir. 1992). Both questions are subject to *de novo* review. *Id.*

The CBA's grievance procedure can be found in Section 9.2 of the CBA and states in relevant part: "A grievance may be initiated by any individual employee, by the Union or by [Jewel]. Once initiated, the following steps *shall be taken* to settle

such grievance ... ." (emphasis added). The provision then sets out a three-step process for resolving grievances. Under the policy, all "[g]rievances involving only one (1) store *shall be introduced only* at Step 1." (emphasis added). Step 1 of the CBA mandates that there be a conference between the aggrieved employee, her store's director or assistant store director, and her Local 881 representative.

It is undisputed that Robinson filed a grievance on Rupcich's behalf prior to her termination and that this grievance only involved one store.[2] Under the CBA, Rupcich was entitled to a Step 1 conference. She did not receive one. In fact, Local 881's counsel conceded during oral argument that the Union did not perform any of the three steps under its grievance policy. Local 881 argues that it did not need to do so because of Local 881 and Jewel's "long-standing practice of bypassing Step 1 in cases of termination." That this practice ignored the plain language of the CBA was of no consequence, according to Local 881, as "[u]nions are 'accorded considerable discretion in dealing with grievance matters.'" (Local 881 Br. at 13 (quoting *Garcia*, 58 F.3d at 1176).)

Local 881 is correct that unions are afforded considerable discretion in their handling of grievance matters. We have recognized in a case upholding a union's decision not to pursue a member's grievance that a union "has discretion to act in consideration of such factors as the wise allocation of its own resources, its relationship with other employees, and its relationship with the employer." *Neal*, 349 F.3d at 369. That discretion, however, does not empower Local 881 to ignore the CBA's plain text where doing so alters an employee's fundamental rights—such as the right to contest one's termination

through a grievance process—through a side arrangement or agreement. Such a side arrangement is contrary to "national labor policy" and "unenforceable as a matter of law" when the arrangement's terms "contradict fundamental terms of a ratified collective bargaining contract." *Merk v. Jewel Food Stores Div. of Jewel Cos., Inc.*, 945 F.2d 889, 894 (7th Cir. 1991).

Section 9.2 of the CBA states that once a grievance is filed, "the following steps shall be taken to settle such grievance." The word "shall" means that Local 881 had to follow the CBA's grievance procedure in processing Rupcich's claim. It is not a discretionary directive left for the interpretation by Local 881 and/or Jewel. Had Local 881 wanted to change its grievance procedure to reflect its "long-standing agreement" with Jewel, it could have amended the CBA pursuant to Section 2.6. But to do so, the parties would have had to execute a written agreement. Neither Local 881 nor Jewel produced evidence of such a written agreement. And, if they had executed such an agreement, the amendment would have had to be added to the CBA and displayed in stores pursuant to Section 8.9, which requires a copy of the CBA "at a place where every employee may have equal and easy access to same." There is no evidence of such an updated CBA being posted at Rupcich's Jewel store or other Jewel stores.

The Second Circuit confronted a similar situation in *Lewis v. Tuscan Dairy Farms, Inc.*, 25 F.3d 1138 (2d Cir. 1994). There, the union made a secret agreement with a company that resulted in a change to the employees' seniority rights under the CBA. In affirming a jury verdict finding the union's actions arbitrary, the Second Circuit observed the union "took no steps

---

**2.** The district court stated that the grievance had been filed *after* Rupcich's termination. The evidence in the record demonstrates that

the grievance had been filed after Rupcich's suspension but *prior* to her termination.

to obtain a proper modification" of the CBA, even though union by-laws required approval and modification of the CBA. *Id.* at 1143. Confronted with these facts, the Second Circuit concluded that "[n]o range of reasonableness can encompass such conduct by a union official." *Id.* (internal quotation marks and citation omitted).

On the record before us, the same can be said of Local 881's actions. This side arrangement, which purports to remove contractual avenues of review for grievances at the Union's whim, is the type of side arrangement that "contradict[s] fundamental terms of a ratified collective bargaining contract." *Merk*, 945 F.2d at 894. It follows then that a jury could reasonably conclude that using such a side arrangement when processing Rupcich's grievance was "so far outside a wide range of reasonableness, as to be irrational." *O'Neill*, 499 U.S. at 67, 111 S.Ct. 1127 (internal quotation marks omitted). *See Aguinaga v. United Food & Commercial Workers Int'l Union*, 993 F.2d 1463, 1471 (10th Cir. 1993) (agreeing with a jury verdict that a secret agreement entered into between a company and a union was arbitrary conduct and observing that such conduct "involve[d] the primary concern that the duty of fair representation was designed to address—*i.e.*, ·the concern that individual employees not be deprived of all effective means of protecting their own ·interests.")

Rupcich also argues that Local 881 acted arbitrarily toward her in declining to pursue her grievance to arbitration when it had taken a substantively similar grievance to arbitration. We agree that a reasonable juror could conclude that this behavior was arbitrary. Part of the reason for why the Supreme Court believed it appropriate for unions to control the grievance process was the belief that unions would treat similar grievances in a consistent fashion. *See Vaca*, 386 U.S. at 191, 87

S.Ct. 903 ("[B]oth sides are assured that similar complaints will be treated consistently ... ."). As such, a union's actions may be considered arbitrary if they have treated substantively similar grievances in a different manner. *See Trnka*, 30 F.3d at 61. Treating similar situations differently without adequate explanation is the very embodiment of arbitrary conduct. That is the rule in the agency context, *see, e.g., Yetman v. Garvey*, 261 F.3d 664, 669 (7th Cir. 2001) ("[A]gency action is considered arbitrary when the agency has offered insufficient reasons for treating similar situations differently."), and we see no reason why unions should not be held to the same standard.

To prove Local 881's arbitrary conduct, Rupcich relies on the case of former Local 881 member and Jewel employee Belinda Mack. Mack was terminated in May 2008 for violating the same misappropriation policy as Rupcich, but the union took her grievance to an arbitrator. Similar to Rupcich, Jewel suspended Mack after it determined that she had not paid for a flat of flowers while scanning her own purchases at a self-checkout counter. Like Rupcich, Local 881 filed a grievance after Mack was suspended. Mack asserted that her failure to pay for the flat of flowers was an inadvertent mistake—the same defense asserted by Rupcich. Nevertheless, just as it did in Rupcich's case, Jewel terminated Mack for violating the misappropriation policy.

In many ways, however, Rupcich's case was stronger than Mack's. The first key difference between Mack and Rupcich's cases is credibility. In Mack's case, Jewel interviewed or took written statements from several employees with personal knowledge of the events surrounding Mack's alleged misappropriation of the flat of flowers. Those witness interviews and statements raised questions about Mack's credibility, as well as her mistake defense.

As for Rupcich, no witnesses were interviewed in her case, including the loss prevention associate who reported the incident. The only statement provided by someone other than Rupcich was loss prevention associate Young's contemporaneous written account. That report was the one that initiated the investigation and was completely consistent with Rupcich's account of events that she provided to Jewel.

Another key difference was that Mack did not have additional corroborating evidence to bolster her mistake defense. Rupcich did. Her evidence included a doctor's note indicating that Rupcich took her grandson to the doctor on the day she purportedly misappropriated the bag of birdseed. It also included a signed letter from the Thornton Police Department indicating that she advised the department she would be unable to perform her crossing guard duties that day because "her grandson had a respiratory emergency." Rupcich has offered evidence that suggests this documentation was provided to Local 881 prior to its decision on Rupcich's appeal. A reasonable juror could draw the inference from these differences that Local 881's decision to not pursue Rupcich's grievance to the extent it did with Mack's was arbitrary.

Perhaps the biggest difference between Rupcich and Mack's cases though is that Local 881 followed the CBA-mandated grievance procedure in Mack's case and pursued her case to arbitration. With Rupcich, Local 881 abandoned her case. Mack lost her case in arbitration, but she lost only after the arbitrator determined under a clear-and-convincing standard that Mack had the *intent* to take the flat of flowers without paying for them. In other words, the arbitrator determined she committed theft.

Local 881 did not address this argument in its brief, but in the court below, the justification it offered for why it did not pursue Rupcich's grievance was that Local 881's grievance coordinator, Bill O'Keefe, believed an arbitrator would not find Rupcich's claim of inadvertence credible. In his first affidavit though, he testified that he did not pursue it solely because Rupcich "admitted to having been stopped past the point of purchase with an unpaid bag of birdseed." In essence, her intent was irrelevant.

Local 881's justification is beyond the pale. One need only look at the arbitrator's decision with respect to Mack to see that intent matters. In fact, the arbitrator relied heavily on statements from other Jewel employees that either contradicted Mack's version of events or discredited some of her statements to Jewel investigative personnel. The arbitrator did not assume that Mack had committed "theft" by admitting that she mistakenly moved merchandise past the point of sale. Instead, he sought *actual* evidence of intent. A reasonable juror could conclude that Local 881's belief that intent did not matter in Rupcich's case, even though it did in Mack's, is arbitrary.

Seemingly recognizing the absurd nature of its claim that intent never matters in enforcing Jewel's misappropriation policy, O'Keefe's supplemental affidavit—filed in Local 881's responsive briefing—reverses course and states that he thought Rupcich's claim of inadvertence was not credible. He apparently came this conclusion because (1) she finished her shift instead of leaving work early to help her sick grandson and (2) she changed her clothes before taking her grandson to the doctor. Both facts, however, do not undermine Rupcich's account or her mistake defense. Both facts do not suggest Rupcich was not in a rush to get home to her grandson when her shift ended, which was less forty-five minutes from when she received the call from her husband. And both facts do

not call into question whether she took her grandson to a doctor's appointment for a respiratory issue, soon after her shift ended. An obvious inference can be drawn that O'Keefe's statements in the supplemental affidavit are post-hoc rationalizations that are not only arbitrary but irrational and beyond unreasonable. The fact remains that no actual evidence that Rupcich intended to steal the bag of birdseed was present in her case, and the Union knew or should have known that after reviewing her case. A reasonable jury could find that Local 881's position "could eventually be deemed not even colorable[.]" *McKelvin*, 124 F.3d at 868 (internal quotation marks omitted and alteration in original).

Finally, turning to causation, a reasonable juror could find on the record before us that had Local 881 followed its CBA-mandated grievance procedure and proceeded to arbitration, Rupcich would have probably prevailed in getting her job back. Section 8.12 of the CBA states that Jewel could only terminate Rupcich for "just cause," which is defined to include "dishonesty or other misconduct" or "serious . . . infraction of reasonable rules promulgated by management relating to the operation of the store." The investigative file provided by Jewel to Local 881 indicates Rupcich's offense was "Misappropriation" and more specifically "Dishonesty/Criminal Acts," and her "Associate Corrective Action Review" states she was terminated for "Misappropriation of Company Property." So, Jewel's "just cause" for Rupcich's termination must be that she violated "reasonable rules" set forth by the management related to store operation or that she committed theft within the meaning of the misappropriation policy.

We can easily dispense with the proposition that Rupcich was terminated pursuant to a reasonable rule related to store operations. There is more than enough evidence in the record for a jury to conclude that

Jewel's misappropriation policy was anything but *reasonable*. Jewel and Local 881 insist that Jewel has a non-intent-based misappropriation policy—that is, an individual can violate the policy without intending to take a product without paying for it. The policy itself, however, does not provide the employee with notice of this non-intent-based definition of misappropriation. Rather, it states the following:

> Misappropriation of company inventory or property, including *theft*, consumption, or unauthorized use is prohibited. Misappropriation of merchandise will result in termination of employment.

(emphasis added). Because the word "misappropriation" is undefined, a Jewel employee attempting to divine what conduct would violate this policy would be left with the examples of "misappropriation" and its dictionary definition. Jewel has conceded—as it must—that Rupcich's conduct would not qualify as unauthorized use or consumption. The only other example then that Rupcich would have to determine whether her conduct would violate the policy is theft, which any reasonable person would assume includes an element of intent. And the dictionary definition would lead Rupcich or any other employee to the same conclusion, as it defines "misappropriate" to mean "appropriate dishonestly for one's own use." Webster's Third New Int'l Dictionary.

But there is even more that demonstrates the unreasonableness of Jewel's misappropriation policy. Novosel, the Jewel associate relations representative who made the decision to terminate Rupcich, testified that not only does Jewel not define misappropriation in its policy, it has another, undisclosed definition for what it deems to be "theft." This Orwellian definition of "theft" is the "taking [of] merchandise past the last point of sale without management authorization." The definition

of theft, according to Jewel, does not include intent. Fine, except that the evidence suggests that Jewel does not even believe its own doublespeak.

Rupcich has directed us to a series of documents that appear to be filled out by Jewel employees who have violated its misappropriation policy. It is a form document entitled "Confidential Employee Statement." In the document, the employee describes the conduct that would appear violative of Jewel's misappropriation policy. At the bottom of the document, it states "[t]his, I realize, was wrong and done with the *intent* of permanently depriving the company of the property." (emphasis added). If intent does not matter to Jewel, then why not have the employee sign a document that states: "I realize I purposefully or mistakenly took Jewel property past the point of sale without paying for it"? Intent then either matters to Jewel or it does not. Either way, a reasonable juror could determine that Jewel's rule is beyond unreasonable and therefore cannot form the basis for a "just cause" dismissal of Rupcich.

As for the second possible basis for Rupcich's purported "just cause" dismissal—"Dishonesty/Criminal Acts"—we have already established above that Rupcich had what a reasonable juror may consider an airtight mistake defense given her credibility, the evidence supporting her mistake defense, and Jewel's complete lack of evidence. That same juror then could also find that an arbitrator would likely determine that Jewel lacked "just cause" to terminate her for "Dishonesty/Criminal Acts" because Rupcich did not have the intent to steal the bag of birdseed.

Taken together, we believe the record demonstrates that a reasonable juror could find that Local 881 breached its duty of fair representation to Rupcich by acting arbitrarily.

### 2. Bad Faith

Rupcich also argues that Local 881 breached its duty of fair representation to her through its bad faith conduct. To determine "[w]hether or not a union's actions are ... in bad faith calls for a subjective inquiry and requires proof that the union acted (or failed to act) due to an improper motive." *Neal*, 349 F.3d at 369; *see also Bennett*, 958 F.2d at 1438–39 (affirming a district court's finding of bad faith where the evidence demonstrated that in addition to giving away plaintiff's CBA rights, the union president worked with the employer's plant manager to conceal the act that harmed the plaintiff). Rupcich, however, has not offered any evidence of an improper motive, such as attempts by the union and management to conceal an agreement to not pursue Rupcich's arbitration. Instead, she repackages the same evidence that demonstrates why Local 881's actions may be considered arbitrary, including Jewel's lax investigation of her grievance. This is insufficient to withstand summary judgment on the grounds that Local 881 acted in bad faith for purposes of a breach of the duty of fair representation.

### B. Breach–of–Contract Claim

Rupcich also argues on appeal that the district court erred in denying her motion for summary judgment on her claim that Jewel breached the CBA and granting Jewel's motion for the same relief. The district court granted summary judgment on behalf of Jewel without reaching the merits of Rupcich's claim against it because a hybrid 301 claim like Rupcich's requires her to demonstrate that "the union breached its duty of fair representation to maintain an actionable § 301 claim against the employer." *Filippo*, 141 F.3d at 748. There was no error in the district court's approach, as it did not need to

address a breach of the CBA claim in a hybrid 301 action like Rupcich's if it determined that the plaintiff does not have an actionable claim against the union for a breach of the duty of fair representation. Rather, the district court's error here was in granting Local 881's motion for summary judgment.

We agree with Rupcich that the district court erred in granting summary judgment to Jewel on her breach of the CBA claim in light of the fact that her claim against Local 881 may go forward. We agree with Jewel, however, that "the issue of whether there was just cause to terminate Rupcich's employment is not appropriate for summary judgment." (Jewel Br. at 8.) Therefore, the district court did not err in denying Rupcich's motion for summary judgment.

### III. Conclusion

For the foregoing reasons, we REVERSE the district court's grant of summary judgment to Local 881 on Count 1 of Rupcich's Amended Complaint (Breach of Local 881's Duty of Fair Representation) and to Jewel on Count 2 (Breach of Contract and Wrongful Termination). We AFFIRM the district court's denial of Rupcich's motions for summary judgment; and, REMAND this case for further proceedings.

